814 F.2d 231
 Lois E. TAYLOR, Personally and on Behalf of Paul Durand
Arnold, Plaintiff- Appellee,
v.
TEXACO, INC., Defendant-Appellant,
v.
DAPTCO MARINE CORPORATION, and Platform Well Service, Inc.,
Defendants- Appellees.
 No. 85-3095.
 United States Court of Appeals,
Fifth Circuit.
 April 14, 1987.
 
 Miles P. Clements, Samuel F. Reynolds, Jr., Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, New Orleans, La., for defendant-appellant.
 John M. Robin, Darryl J. Tschirn, Covington, La., for plaintiff-appellee.
 Wendell Stout, New Orleans, La., for Daptco.
 Thomas E. Balhoff, Baton Rouge, La., for intervenor La. Ins. Guar.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before GARWOOD, JOLLY and HILL, Circuit Judges.
 ROBERT MADDEN HILL, Circuit Judge:
 
 
 1
 In this appeal Texaco, Inc., argues that the district court erred in holding it 25 percent liable for the death of Paul Durand Arnold, a roustabout who was killed when a fire erupted on the Texaco production platform on which he was working. The fire occurred during a fuel transfer procedure. Texaco contends that, inter alia, the district court incorrectly denied its motion for judgment notwithstanding the verdict, or, alternatively, for a new trial on the issue of its alleged negligence. Upon our review of the record, we find that there is no evidence of any negligence on the part of Texaco and accordingly reverse the district court's order denying Texaco's motion for judgment notwithstanding the verdict.[1]
 
 I.
 
 2
 This litigation commenced after Arnold was killed in a fire that occurred on a Texaco-owned fixed production platform in the Gulf of Mexico on January 7, 1982. At the time of the fire, Platform Well Service, Inc., (PWS) drilling rig No. 8 was located on the top deck of Texaco's platform and was conducting drilling operations pursuant to a Texaco-PWS drilling contract. This contract provided, among other things, that PWS was to man and operate its drilling rig in its entirety, and defined the status of PWS as that of an independent contractor.
 
 
 3
 Texaco had also entered into a contract with Daptco Marine Corporation (Daptco) under which Daptco was to provide marine transportation and to carry supplies to the platform. The agreement provided that Daptco would man and operate the M/V JUANITA PATRICK for this purpose.
 
 
 4
 In addition to the equipment required by PWS for its drilling operations, Texaco had production equipment located on the platform. This production equipment was separate from the equipment used by PWS and was operated by a crew of approximately six Texaco employees. The PWS equipment was powered by diesel fuel, and the Texaco equipment was powered by natural gas.
 
 
 5
 On January 7, 1984, the M/V JUANITA PATRICK arrived at the platform and radioed for instructions. The vessel was informed that a PWS fuel tank was to be filled with diesel fuel. The PWS crane operator lowered the platform's fuel hose, one end being attached to the fuel tank and the other end being attached to the vessel's fuel hose. PWS personnel advised the Daptco chief engineer that approximately 1200 gallons of fuel were needed. The engineer commenced the transfer operation.
 
 
 6
 Arnold, a new PWS employee serving as a roustabout,[2] was assisting in the fuel transfer operation. Once the fuel hose was lowered, the crane operator gave a Texaco walkie-talkie to Arnold and another PWS roustabout, David Welborn, who were to actually conduct the refueling.
 
 
 7
 The PWS fuel tank was a large rectangular tank, 30 feet long, 8 feet wide, and 2 feet high. The tank was situated on the main deck of the platform and was flat, enabling workers to stand on it. The tank did not have an automatic venting system or sight gauge. Thus, in order to determine the amount of fuel in the tank and to vent the tank (i.e., allow the air to escape while filling the tank) and facilitate the intake of fuel, it was necessary for Arnold and Welborn to unscrew a 4-inch (diameter) "bull" plug located on top of the tank at the end farthest from the edge of the platform. Proper procedure in filling the tank would be to remove the bull plug prior to pumping the fuel and not to replace it until pumping had ceased and the shut-off valve, located on a short pipe extension above the tank where the fuel hose was connected, had been closed.
 
 
 8
 The bull plug was located approximately 10 feet away from a generator building that housed generator engines owned by Texaco and used in its production operation. Located approximately 10 feet above the bull plug were two generator exhausts[3] that extended out from the generator building. The exhausts were not directly over the bull plug but were recessed several feet back; they also pointed upward. Both exhausts were insulated and were equipped with spark arrestors. The testimony indicated that the exhausts were approximately 6 feet apart from each other. Also, two radiator fans were located against the side of the generator building, beneath the exhausts, and blew air away from the building across the fuel tank.
 
 
 9
 On the day of the fire the exhaust closest to the bull plug was cold. The engine attached to the exhaust inside the building had been turned off for several hours prior to the fuel transfer because of routine inspection servicing being performed by a Reagan Equipment Company serviceman, George Redding. The other exhaust was examined after the fire and showed no sign of fire damage and was not within the area damaged by the fire.
 
 
 10
 At the commencement of the filling of the fuel tank, Arnold and Welborn removed the bull plug. As the fuel appeared to be coming near to the top of the tank, Arnold used the walkie-talkie to order the M/V JUANITA PATRICK to cease pumping, but he was unable to establish contact. At that point, with neither Arnold nor Welborn using the shut-off valve to stop the flow of fuel into the tank, Welborn took the walkie-talkie and walked the length of the fuel tank to the side of the platform and again called to the vessel, ordering them to shut down the fuel pump. This time the M/V JUANITA PATRICK indicated its understanding of the order.
 
 
 11
 There was conflicting testimony concerning whether the pump was immediately turned off, or left running, or whether it was turned off and then turned back on again. At any rate, it is apparent that too much fuel was pumped. As Welborn returned to the fuel tank, he saw Arnold crouched over the bull plug with his hand on it, apparently trying to screw it back into the tank. By this time diesel fuel was spilling out of the tank. Also, the effect of attempting to screw the bull plug in while fuel was still being pumped into the tank was to pressurize the fuel and cause it to be sprayed out in various directions about the area, reaching as far away as Welborn, who was approximately 25 feet away. Welborn attempted to warn Arnold but heard a "whoosh"-type noise as Arnold, covered with diesel fuel, caught fire. Welborn turned and ran, feeling diesel fuel strike his back as he ran.
 
 
 12
 The fire alarm was sounded and the flames on Arnold were ultimately extinguished. A helicopter was dispatched and Arnold was flown to a hospital, where he subsequently died. Lois E. Taylor, Arnold's mother, filed suit against Texaco, Gulf Oil Exploration, and Daptco.[4] Texaco filed a third-party complaint against PWS and a cross-claim against Daptco.
 
 
 13
 Trial was before a jury. Following the close of the evidence, the district court entered a directed verdict in favor of PWS on the third-party complaint of Texaco. Texaco's motion for a directed verdict was denied. The jury returned its verdict, finding both Texaco and Daptco guilty of negligence contributing to the death of Arnold, assessing their percentage of liability at 25 and 75 percent, respectively. Taylor was awarded $500,000 for the loss of society of her son and $750,000 for the conscious pain and suffering of her son prior to his death. The district court entered judgment in favor of Taylor in the amount of $1,250,000, together with interest from the date of the judgment, plus all costs, and ordered that Texaco was liable for 25 percent of the judgment and Daptco was liable for 75 percent of the judgment.
 
 
 14
 Following the entry of judgment, numerous post-trial motions were made. It is not necessary for purposes of this appeal to describe all these motions. However, the district court did grant Daptco's motion for a new trial unless Taylor filed a written acceptance of a remittitur of the award to a total amount of $500,000. Taylor accepted the remittitur. The court also granted Texaco's motion for judgment notwithstanding the verdict based on Washington Metropolitan Transit Authority v. Johnson, 467 U.S. 925, 104 S.Ct. 2827, 81 L.Ed.2d 768 (1984). Daptco subsequently moved for reconsideration of this decision.
 
 
 15
 The district court thereafter granted Daptco's motion for reconsideration of the granting of Texaco's motion for judgment notwithstanding the verdict.[5] The court reached this conclusion based on its view that Washington Metropolitan was legislatively overruled by the amendments to the LHWCA. The court, therefore, amended the portion of its prior minute entry, which absolved Texaco from liability and substituted an entry that found Texaco liable for its own negligence.[6] An amended judgment was entered in favor of Taylor and against Daptco (75%) and Texaco (25%) in the amount of $500,000, together with costs and legal interest from the date of judicial demand. Texaco now appeals,[7] contending that the district court erred in finding it at fault and not granting its motion for judgment notwithstanding the verdict.[8]
 
 II.
 
 16
 The standard of review of a court's granting or denying of a motion for judgment notwithstanding the verdict has been well-established in this circuit since Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir.1969) (en banc). In Boeing Co. we stated that in determining whether such a motion should be granted
 
 
 17
 the Court should consider all the evidence--not just that evidence which supports the non-mover's case--but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment notwithstanding the verdict should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.
 
 
 18
 Id. at 374-75 (footnotes omitted). The standard governing judgments notwithstanding the verdict remains the same on appeal. Dawsey v. Olin Corp., 782 F.2d 1254, 1261 (5th Cir.1986). We emphasize, however, that while "[i]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses," Boeing, 411 F.2d at 374, nevertheless, "[a] mere scintilla of evidence is insufficient to present a question for the jury," and "[t]here must be a conflict in substantial evidence to create a jury question." Id. at 375. The jury cannot rest its verdict on speculation and conjecture. Mack v. Newton, 737 F.2d 1343, 1351 (5th Cir.1984).
 
 
 19
 Our review of the evidence leads us to the conclusion that the district court erred in not upholding Texaco's motion for a judgment notwithstanding the verdict. We find no basis in the record by which reasonable jurors could have found Texaco to be negligent. In denying Texaco's motion, the district court hypothesized several potential reasons why the jury might have imposed liability on Texaco:
 
 
 20
 approving plans calling for the placement of the diesel tank too near to Texaco's own generator exhaust manifold; failing to move its own generator exhaust manifold out of the proximity to the diesel tank; failing to maintain adequately its own generator exhaust manifold; providing a defective generator exhaust manifold; or operating its generator, which had an exhaust manifold near the diesel tank, during fuel operations.
 
 
 21
 These conclusions presuppose that Texaco's exhausts caused the fire. The evidence, however, belies such a contention.
 
 
 22
 First, only the engine farthest from the fuel tank was running; thus, it was the only exhaust of the two that could possibly have been a source of ignition and it was located some six feet to the side of the bull plug. Moreover, both exhausts were about ten feet above the fuel tank, as well as being somewhat recessed, and there were radiator fans blowing vapors from the tank away from the exhausts. The exhausts also were insulated and had spark arrestors. The Reagan Equipment Company serviceman, Redding, had also serviced the engines the day of the fire, including examining the exhaust pipes. He stated that one could place his hand over the exhaust without burning it, indicating that the temperature was not sufficiently hot to ignite diesel fuel. After the fire he also examined the exhausts. He stated that there was no sign of any fire damage nor any sign of sparking. He stated that if there had been a spark that the spark arrestor had not caught, there would have been evidence of burned condition. Evidence was also presented regarding the combustion of diesel fuel. An expert witness testified that for diesel fuel (not diesel fuel vapors) to ignite, it must come into contact with some object that is at least 494 degrees fahrenheit in temperature.
 
 
 23
 Thus, the testimony of Redding was that a person could, albeit uncomfortably, touch the exhaust pipe of the running engine. Certainly such a temperature is well below the 494 degrees required of a source to ignite diesel fuel. Thus, if the exhaust pipe were the cause, it would have had to have been from the fuel vapors. The flash point of diesel fuel (the point at which the diesel fuel will give off flammable vapors) is 100 degrees.[9] But the uncontroverted testimony of Redding was that there was no evidence of any sparking. Without a spark the vapors could not be ignited. The evidence, therefore, does not support a jury finding that Texaco was negligent through the use or placement of its generator exhausts.
 
 
 24
 The only evidence presented by Daptco in support of a theory that the exhausts caused the fire was from reports prepared by two Texaco employees, Gerard Victoriano and Clifford Journey. Victoriano was Texaco's operator's representative (the employee who oversaw Texaco's interest in the drill operation or workover operation) on the platform at the time of the fire. After the fire Victoriano conducted an investigation and filled out an accident report. In this report Victoriano gave the following description of the accident: "While taking on fuel from supply boat the diesel tank was pressurized up. When [Arnold] tried to remove plug to check the level in the tank the plug flew off and diesel blew into the air and was ignited, probably by gen[erator] exhaust or rig air compressor." Daptco relies, in part, on this statement to prove Texaco's negligence. However, at trial Victoriano testified that "I listed that as a possible source of ignition. When we did the investigation, we didn't conclude anything as this is it.... [W]e could not narrow it down to say this is it. I certainly couldn't." Thus, at the time of his report Victoriano was unable to determine the cause of the ignition of the diesel fuel.
 
 
 25
 Daptco also presented evidence that Journey listed in his report that the fire was apparently caused by the generator exhaust. However, he testified that there were several possible ignition sources, and that he was not exactly sure what caused the fire.
 
 
 26
 Thus, while both Victoriano and Journey filed reports indicating that the generator was a possible source of ignition, neither was certain it was the source. We do not believe that this evidence supports a finding that Texaco was negligent through the operation of the generators or in their placement. The evidence of the employees' reports is not only inconclusive, it also is only a mere scintilla of evidence that the generator exhausts caused the fire. When compared to the opposing evidence that the exhausts were not the cause of the fire, there is not substantial evidence to create an issue that only a jury could resolve. To allow the jury verdict to stand against Texaco on the basis of the two reports would be to allow the verdict to rest on speculation and conjecture.
 
 
 27
 Daptco propounds several other theories as a basis for finding Texaco negligent. In particular, Daptco argues that "[t]he negligence of Texaco, Inc. ... in failing to comply with or even be aware of the applicable Coast Guard regulations for fueling operations, and in failing to conduct safety meetings or insist on a properly vented diesel tank equipped with sigh guage [sic] and overflow line was a substantial cause of the fire and resultant death of Paul Arnold."[10] Even assuming the truth of Daptco's assertions, the evidence does not support that Texaco's failure to comply with the Coast Guard regulations or to conduct safety meetings was a factor contributing to the accident. The evidence conclusively showed that Texaco was not involved in the refueling operations. Instead, its two independent contractors, PWS and Daptco, were the sole responsible parties. The apparent approval by Texaco of the PWS fuel tank does not offer a basis of liability either. There was no evidence presented that the tank used was itself inherently dangerous, or of any requirements that Texaco could only allow certain types of fuel tanks to be used, and that the PWS tank was not one of those. Instead, the evidence showed that PWS brought its own fuel tank and had properly, without incident, refilled it almost every third day for a number of months. There is no conflict in the evidence regarding the fuel tank,[11] and there is not substantial support in the record to find Texaco negligent on this basis.
 
 III.
 
 28
 For the foregoing reasons, we REVERSE the district court's denial of Texaco's judgment notwithstanding the verdict and REMAND for entry of judgment in favor of Texaco.
 
 
 
 [1]
 Texaco also argues that the district court erred in granting a directed verdict in favor of Platform Well Service, Inc., in dismissing both its claim for contractual indemnity on the basis of the Louisiana Oilfield Indemnity Act, La.Rev.Stat.Ann. Sec. 9:2780, and its claim for breach of an express warranty of workmanlike performance contained in the Texaco-PWS drilling contract, and in failing to reduce further the jury verdict. Since we find that Texaco was not negligent, and reverse on that basis, there is no need to address these other assignments of error
 
 
 [2]
 Arnold was a green hand, with no previous oilfield experience. He had arrived at the platform for his first assignment with PWS on January 6; thus, he was at his second day of work
 
 
 [3]
 The distance between the exhausts and the fuel tank was never conclusively established. One estimate ranged from 7 to 10 feet and another ranged from 12 to 15 feet. In their briefs, Texaco approximates the distance as being 10 to 12 feet, and Daptco approximates it at 10 feet. The exact distance is not important for the purposes of this appeal
 
 
 [4]
 Gulf was originally sued by Taylor because it owned an interest in the mineral lease and in the production of the platform pursuant to an agreement between it and Texaco. To simplify matters, it was stipulated that Texaco was the owner of the platform, and it appears that at some point in the proceedings Gulf was dropped from the suit
 
 
 [5]
 Daptco, being cast in judgment for the full award at the time and seeking to stop the running of interest, satisfied the judgment, but reserved its right to seek reimbursement against Texaco should Daptco ultimately prevail on its motion to reconsider Texaco's dismissal
 
 
 [6]
 The relevant portion of the amended minute order states:
 Under the general rule, since Texaco did not retain control over the manner of performance of the workover operations on the platform, nor over the fueling operation in which Arnold was killed, Texaco cannot be held vicariously liable for the negligence of Daptco or Platform Well Service in the performance of those operations, nor directly liable for failing to prevent those independent contractors from performing those operations in a dangerous manner. However, there was sufficient evidence presented from which the jury might reasonably have concluded that Texaco was negligent in some other manner that proximately caused Arnold's death. Specifically, the jury might reasonably have imposed liability on Texaco for: approving plans calling for the placement of the diesel tank too near to Texaco's own generator exhaust manifold; failing to move its own generator exhaust manifold out of proximity to the diesel tank; failing to maintain adequately its own generator exhaust manifold; providing a defective generator exhaust manifold; or operating its generator, which had an exhaust manifold near the diesel tank, during fueling operations. The general rule does not preclude Texaco's liability for any of these acts or omissions of Texaco concerning its own equipment on its own platform. Thus, Texaco is not entitled to judgment notwithstanding the jury verdict finding fault on its part. (footnote omitted).
 
 
 [7]
 Texaco was the only party to appeal. Also, after the notice of appeal was filed, PWS's insurer became insolvent. The Louisiana Insurance Guaranty Association, pursuant to state law, gave notice it would act on behalf of the insurer
 
 
 [8]
 As discussed in note 1, supra, Texaco raises other issues, but our finding that Texaco was not negligent, and therefore not liable, precludes the necessity of reaching them
 
 
 [9]
 As a means of comparison, the boiling point of water is 212 degrees
 
 
 [10]
 Daptco also argues that Texaco was negligent in directing the placement of the diesel fuel tank directly beneath the generator exhausts. This rationale is the same as that offered by the district court, above, which we have rejected
 
 
 [11]
 In fact, as soon as the PWS rig was placed on the platform the United States Geological Service and the Coast Guard conducted an inspection and found no unsafe conditions. Also, the Coast Guard made regular inspections of the platform and never issued any citations or made any comment concerning any noncompliance of Coast Guard regulations regarding the fuel tank