**Beverly J. DEAN, Plaintiff–Appellee Cross–Appellant,**

v.

**FORD MOTOR CREDIT COMPANY, Defendant–Appellant Cross–Appellee.**

No. 88–1800.

United States Court of Appeals, Fifth Circuit.

Oct. 11, 1989.

Richard R. Brann, Paul L. Mitchell, Houston, Tex., for defendant-appellant cross-appellee.

Eric W. Schulze, Austin, Tex., John Judge, Amarillo, Tex., for plaintiff-appellee cross-appellant.

Before GEE, REAVLEY, and JOLLY, Circuit Judges.

GEE, Circuit Judge:

The plaintiff brought suit in federal court against her former employer, alleging two claims under Title VII and a pendent claim under Texas law for intentional infliction of emotional distress. The defendant filed a Rule 12(b)(6) motion to dismiss the plaintiff's emotional distress complaint on the ground that it failed to state a claim upon which relief could be granted. The district court denied this motion, holding that the complaint did state a claim and giving the plaintiff leave to file a supplemental complaint that clarified her emotional distress claim.

That claim was tried to a jury, and at the same time plaintiff's Title VII claims were tried to the district court. At the close of the plaintiff's case, the defendant moved for an order of dismissal pursuant to Fed. R.Civ.P. 41(b) or a directed verdict pursuant to Fed.R.Civ.P. 50(a). The district court denied this motion. The jury returned a verdict for the plaintiff on her emotional distress claim, awarding her a total of $275,000 for past, future and punitive damages. The defendant then filed a motion for judgment notwithstanding the verdict or, alternatively, for a new trial. The district court denied this motion. On the same date the district court issued a memorandum opinion on the plaintiff's Title VII claims, holding that the plaintiff had failed to prove retaliatory discharge and entering judgment for the defendant on that issue.

On appeal the defendant contends that the district court erred in denying its Rule 12(b)(6) motion to dismiss the plaintiff's emotional distress claim. The defendant also contends that the district court erred in denying its motions for a directed verdict and judgment notwithstanding the verdict on the emotional distress claim. The plaintiff cross-appeals, contending that the district court erred by failing to address her Title VII claim for failure to promote. We affirm.

*Analysis*

I. Defendant's Rule 12(b)(6) Motion

The defendant contends that the plaintiff's complaint failed to state a claim for

intentional infliction of emotional distress and that the district court erred, therefore, in denying its motion to dismiss. The plaintiff argues that this contention was not properly preserved for appeal. We agree.

"A defense that the complaint fails to state a claim for which relief can be granted may not be asserted for the first time on appeal. If, however, the defense is actually raised in the trial court, it is not waived by failure to assert it in a specific manner...." *Madore v. Ingram Tank Ships, Inc.*, 732 F.2d 475, 479–80 (5th Cir.1984) (citations omitted). In this case the defendant contends that it properly preserved this issue for appeal by raising that issue in both its Rule 12(b)(6) motion and its joint pretrial order. Additionally, the defendant contends that it raised the issue again in its motion for dismissal and its motion for judgment notwithstanding the verdict. Neither contention has merit.

▪ The defendant filed its Rule 12(b)(6) motion in response to the plaintiff's original complaint. After that motion was denied the plaintiff, with the court's permission, filed a supplemental complaint clarifying her emotional distress claim. The defendant failed to raise the issue of the sufficiency of the complaint with respect to the "supplemental" complaint, thus failing to preserve the issue for appeal. The defendant argues that it was not required to challenge the sufficiency of the supplemental complaint because it, unlike an amended complaint which replaces the original complaint, "merely represents additions to or continuations of the earlier pleading." 6 C. Wright & A. Miller, Federal Practice & Procedure, § 1504 at 540 (1971). According to the defendant, the original complaint remained "live" and its Rule 12(b)(6) motion therefore applies to the supplemental as well as the original complaint.

The defendant's argument misconstrues the basic difference between amended and supplemental claims as set forth by Wright & Miller at the exact section and page cited by the defendant. According to Wright & Miller,

[a]mended and supplemental pleadings differ in two respects. The *former relate to matters that occurred prior to the filing of the original pleading* and entirely replace the earlier pleading; *the latter deal with events subsequent to the pleading to be altered* and merely represent additions to or continuations of the earlier pleading. *Id.* (Emphasis added.)

In other words, the important distinction between amended and supplemental pleading is when the events pleaded occurred. The defendant also ignores the remainder of the cited paragraph in which the authors state:

[p]arties and courts occasionally confuse supplemental pleadings with amended pleadings and mislabeling is common. However, these misnomers are not of any significance and do not prevent the court from considering a motion to amend or supplement under the proper portion of Rule 15. Indeed, the distinction between amendments and supplemental pleadings is sometimes ignored completely. *Id.* at 541. (Emphasis added.)

In this case the plaintiff's second complaint clearly related to matters that occurred prior to the initial pleading. Therefore, despite its designation as a "supplemental complaint" it was in fact an amended complaint that replaced the original complaint. Therefore, the defendant's Rule 12(b)(6) motion did not address the second complaint.

▪ The defendant's motion to dismiss—filed after the close of the plaintiff's case-in-chief—and its motion for judgment n.o.v. also fail to challenge the sufficiency of the plaintiff's complaint. In its motion to dismiss, the defendant maintains that plaintiff "has failed to present any evidence" of emotional distress or outrageous conduct. This language challenges the sufficiency of the evidence, not the sufficiency of the plaintiff's allegations in her complaint. Similarly, in its motion for judgment n.o.v. the defendant states that the plaintiff "failed to present any competent evidence ..." that plaintiff suffered emotional dis-

tress or that defendant acted outrageously. Again, this language challenges the sufficiency of the evidence, not the sufficiency of the allegations in the complaint. We, therefore, conclude that the defendant failed to raise this defense in the trial court.

■ Perhaps anticipating our response to its arguments that it preserved the issue for appeal, the defendant raises the novel, albeit wholly meritless, argument that the district court had an independent duty itself to determine sua sponte whether the plaintiff's allegations satisfied the threshold requirements of extreme and outrageous conduct. The defendant cites numerous cases in support of its contention that this supposititious duty exists, independent of the adversary process and absent a valid challenge to the complaint by the defendant. In alleging that these cases support its argument the defendant comes dangerously close to playing fast and loose with both the law and this court.

These cases do, in fact, state that in the first instance the court must determine whether a complaint alleges conduct sufficiently outrageous to support an action. In each case, however, the court was required to make that determination by a defendant's challenge to the complaint, either by a motion to dismiss or by a motion for summary judgment. The court has no independent duty to make any such determination. The defendant having failed to preserve the issue, and the district court having no independent duty to do so, it is not properly drawn before us.

### A. *Facts*

The plaintiff was employed as a clerk in the Administrative Department of the defendant's Amarillo office from November 1981, until she was fired in July 1985. All of the clerks in the Administrative Office were women. The defendant's Amarillo office also contained a collection department. Throughout the plaintiff's employment with the defendant, Russ Archer was the Assistant Branch Manager and Joe Lumpkin was the Branch Manager.

During the plaintiff's employment with the defendant the defendant had an established performance review system. Under the system each employee received an annual formal performance review. In addition, the system called for each employee to receive an informal "interim review" between formal annual reviews. The purpose of the interim review was to advise employees of areas in which they might need improvement so that they could adjust their performance before the next annual review.

In November 1982 the plaintiff had her first annual performance review, receiving an overall performance rating of "satisfactory." During the course of the review the plaintiff expressed an interest in transferring to the collection department. A position in this department would have paid higher wages and would have been a promotion. The plaintiff testified that, in response to her expressed interest in a transfer, Mr. Archer, the Assistant Manager, "grinned" and stated that "women usually don't go into that department." As a result of this conversation the plaintiff wrote to the defendant's area regional manager regarding her dissatisfaction with the branch office's policy with respect to hiring women for the collection department. The regional manager responded, acknowledging the plaintiff's "statements relative to the promotional progress of non-male employees." The regional manager apparently took no further action with respect to the plaintiff's letter.

In December 1983 plaintiff received her second annual formal review. This was performed by plaintiff's supervisor, Danny Anderson; and in it her overall performance evaluation was upgraded from "satisfactory" to "satisfactory plus." The next month, January 1984, plaintiff received a promotion to a higher clerk position and a raise. That same month the plaintiff learned that a position would be opening in the collection department. At that time the plaintiff sent a written memo to Mr. Lumpkin, the branch manager, requesting that she be considered for that opening. The plaintiff formally applied for the position in the collection department when it opened in

February of 1984. The defendant hired a man for this position. The plaintiff contends that she was as qualified, if not more so, for the position as the person hired. Both Mr. Lumpkin and Mr. Archer testified that, despite the plaintiff's recent promotion and raise, the plaintiff was not considered for the new position because "she really wasn't doing well enough" in her clerk's job.

Beginning in the Spring of 1984, the plaintiff's co-workers began to notice a change in the defendant's attitude toward the plaintiff. Ms. Hall, one of these co-workers, noticed that the management began to transfer the plaintiff from desk to desk within the administrative department. Ms. Hall also testified she believed that Mr. Archer was trying to "set ... [the plaintiff] up." The plaintiff testified that during this time she believed that she was called upon to do more work than other clerks and subjected to unfair harassment. During this time the plaintiff also began to receive "special" annual reviews. These included one in August 1984, one in March 1985, and one in July 1985. Mr. Archer acknowledged that only the plaintiff received three annual reviews in less than 12 months, stating on the document used for the plaintiff's August 1984 "special" review that it was a "special performance review ... to downgrade this employee's performance to satisfactory." One week after Mr. Archer gave this review he again began receiving applications for a position in the collections department.

Between the plaintiff's August 1984 and July 1985 "special" reviews two bizarre incidents occurred. On December 12, 1984, while the plaintiff was functioning as a cashier processing checks received in the mail, she was informed that a check was missing. She reported this fact to Mr. Archer who told her that the check would "show up somewhere." Ten days later the plaintiff discovered the missing check lying on top of the coin compartment in her own cash box. Mr. Archer had initialed the plaintiff's daily cash memos only twice in December 1984; the date the check disappeared and the date it reappeared. Another employee testified that it was unusual for Archer, who had keys to all the cash boxes, to initial two daily cash memos in one month.

On December 28, 1984, the day after the first check reappeared, plaintiff was again functioning as a cashier and processing checks. On her lunch hour the plaintiff went to her personal bank. When she opened her purse at the bank she discovered in her purse two checks made out to and endorsed by the defendant. One of these checks contained a notation in Mr. Archer's handwriting. Mr. Archer admitted that he had probably handled the check before it got into the plaintiff's purse. He had, however, failed to initial it to indicate that he had done so, a procedure required by company policy.

The plaintiff testified that the "check incidents" convinced her that Mr. Archer was attempting to set her up and prevent her transfer to the collections department. The plaintiff testified that as a result she began to experience constant insomnia, headaches and nervousness. She testified that she became "paranoid" about what would next happen to her at work.

When Mr. Lumpkin, who had been on vacation during the check incidents, returned to work, plaintiff informed him of the incidents. Mr. Lumpkin instigated an internal investigation. This investigation was conducted by Ms. Cox of the defendant's home office. Neither Mr. Lumpkin nor Ms. Cox informed Mr. Archer of the investigation. Mr. Archer testified that when he learned of the investigation he felt his character had been "impugn[ed]." Shortly after Mr. Archer learned of the investigation the plaintiff received her second "special" review. Within a month of this review, in which the plaintiff's overall performance rating was downgraded to "satisfactory minus," the defendant was again filling a position in the collections department.

On the plaintiff's second "special" review, given to her on March 15, 1985, it stated that the plaintiff's performance would be re-evaluated in 60 days and that she would be released if her performance

did not improve to at least a satisfactory level. Prior to receiving this review the plaintiff talked with Ms. Cox at the home office regarding this review. The plaintiff testified that Ms. Cox told her that following the review plaintiff "was to do none other than the job duties that were given to ... [her] on the performance review...." This would give the plaintiff's supervisor "the opportunity to observe and evaluate ... [the plaintiff] on specifically those job duties that were listed in ... [her] performance review."

During the 60 days following this review, however, the plaintiff was switched from function to function and desk to desk without regard to whether these functions involved the duties listed on her evaluation. The defendant did not conduct a review, despite her repeated requests, at the end of the 60 day period. Consequently, the plaintiff approached her former supervisor, Mr. Law, who had been recently transferred, and requested that he prepare an interim review. Mr. Law prepared and forwarded to Amarillo an interim review giving the plaintiff an overall performance rating of "satisfactory plus." The company, however, did not consider this review to be official.

On July 22, 1985, more than 60 days after the 60–day deadline had come and gone, plaintiff again asked her supervisor for a final performance review. The supervisor again put off the plaintiff and directed her to continue working on duties that were not listed on her performance review. The plaintiff questioned this order, but complied. That morning plaintiff went on a coffee break with a co-worker, Ms. Hall. Ms. Hall testified that the plaintiff was visibly emotionally upset about the check incidents, about her failure to receive the promised evaluation, about what duties she was expected to perform, and about whether she would be fired. Ms. Hall testified that the plaintiff was seriously upset, crying and stating that she was not returning to work until management told her what they intended to do about her performance review. Ms. Hall testified that she told the plaintiff that this action might jeopardize her job but that the plaintiff "was so upset

it didn't matter," that she "was just hysterical basically."

The plaintiff did not return to work that day. Late in the afternoon she received a call from Mr. Lumpkin. The plaintiff agreed to return the next day to discuss the matter further. The next morning the plaintiff met with Mr. Lumpkin and her supervisor. Neither Mr. Lumpkin nor Mr. Smith offered any explanation for the delay in conducting the plaintiff's performance evaluation. Instead, Mr. Lumpkin instructed the plaintiff to return to work on a job for which she was not being evaluated. The plaintiff refused to do so or to leave Mr. Lumpkin's office until she received her review. Mr. Lumpkin then told the plaintiff she was suspended, and the plaintiff left the office.

On July 29, 1985, the plaintiff was called back to work and given her final review and a copy of Mr. Law's "unofficial" interim review. Mr. Archer, who prepared the final review, had down-graded five "excellent" or "satisfactory plus" ratings given by Mr. Law to ratings of either "unsatisfactory," "satisfactory minus" or "satisfactory." The plaintiff's final overall rating was "unsatisfactory." The plaintiff was fired that day.

The plaintiff testified that after her discharge she continued to have sleep problems, headaches and nervousness. She testified that she was emotionally upset by her unfair treatment, loss of salary and medical benefits. She also testified that her on-the-job problems contributed to her subsequent divorce.

## II. Defendant's Motion For Directed Verdict and Judgment N.O.V.

### A. *The Standard of Review*

On motions for directed verdict and for judgment notwithstanding the verdict, the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in

favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

*Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc).

The defendant maintains that under this standard, on the evidence summarized above, the district court should have granted its motions for directed verdict or judgment n.o.v. because the evidence was insufficient to support the jury's finding that the defendant's conduct was extreme and outrageous or that the plaintiff suffered severe emotional distress.

### B. *Discussion*

To prevail on a claim for intentional infliction of emotional distress, Texas law requires that the following four elements be satisfied: "(1) the defendant acted intentionally or recklessly, (2) the conduct was 'extreme and outrageous', (3) the actions of the defendant caused the plaintiff emotional distress, and (4) the emotional distress suffered by the plaintiff was severe." *Tidelands Auto Club v. Walters*, 699 S.W.2d 939, 942 (Tex.App.—Beaumont, 1985, writ ref'd, n.r.e.).

### 1. *Outrageous Conduct.*

Conduct is "outrageous" if it surpasses "all possible bounds of decency," such that it is "utterly intolerable in a civilized community." Restatement (Second) Torts Section 46, Comment d.

Liability [for outrageous conduct] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.... Generally, the case is one in which a recitation of the facts to an average member of the community would lead him to exclaim, "Outrageous."

The plaintiff contends that the defendant's conduct with respect to the "check incidents", taken alone, was outrageous. Additionally, the plaintiff contends that the defendant's conduct, taken as a whole, was outrageous.

The defendant does not question the truth of the plaintiff's statement that she found company checks in her purse or that a company check disappeared and then reappeared. Rather the defendant's argument focuses on its contention that the evidence at trial was insufficient to support a finding that the defendant was in any way responsible for causing the checks to disappear or for causing checks to be placed in the plaintiff's purse.

According to the defendant, the sole evidence that Mr. Archer was involved with these checks was the "self serving," "speculative" testimony of the plaintiff. The defendant notes, in addition, that this testimony was contradicted by Mr. Archer himself. In responding to this argument, we commence by bringing to the parties attention the fact that characterizing a party's testimony as "self serving" is not useful to the court. In a lawsuit, where each party is attempting to advance his own cause and protect his own interests, we are scarcely shocked when a party produces evidence or gives testimony that is "self-serving." We could, therefore, and without casting aspersions, characterize both the plaintiff's and Mr. Archer's testimony as self-serving. That aside, we now address the defendant's contention that the sole evidence connecting Mr. Archer to the checks was the plaintiff's testimony, a contention we reject.

In addition to the plaintiff's testimony that she believed that Mr. Archer was involved with the "check incidents", the following facts were established at trial:

(1) Archer had keys to the plaintiff's cash box;

(2) Archer initialed the plaintiff's daily cash memos on the days that the first check disappeared and reappeared;

(3) These were the only days in December on which Archer initaled the plaintiff's daily cash memos;

(4) It was unusual for Archer to initial daily cash memos at all;

(5) Archer wrote on one of the checks which appeared in the plaintiff's purse;

(6) Archer did not initial these checks, as required by company policy, to indicate that he had handled them.

■ A jury verdict may not be based on mere speculation and conjecture. *Taylor v. Texaco, Inc.*, 814 F.2d 231 (5th Cir.1987). A jury is free, however, to draw reasonable inferences from the evidence presented. *Boeing Company v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc). Here the jury could have easily inferred that Mr. Archer, who had access to the checks and apparently handled at least one of them, intentionally placed the two checks in the plaintiff's purse in order to make it appear that she was a thief, or to put her in fear of such an accusation. There was, therefore, sufficient evidence to support a jury finding that the "check incidents" occurred and that the defendant was involved in those incidents. The jury so found; there it ends.

■ The defendant next maintains that even if the evidence supports a finding that the defendant was involved in the "check incidents" this conduct was not outrageous. That the defendant would even make such an argument is, itself, outrageous. The fact that the "check incidents" occurred and that the defendant was responsible for them is precisely what takes this case beyond the realm of an ordinary employment dispute and into the realm of an outrageous one. Such conduct simply will not be tolerated. In support of its argument the defendant notes that it never accused the plaintiff of theft and that merely imputing careless work habits to a plaintiff is not outrageous conduct. The fact that the defendant did not accuse the plaintiff of theft is irrelevant. Merely causing the innocent plaintiff to be subject to such an accusation of crime and putting her in fear that it might come passes the bounds of conduct that will be tolerated by a civilized society and is, therefore, outrageous conduct.

The defendant further contends that we cannot examine the sum total of the defendant's individual acts toward the victim to determine whether the defendant's conduct was outrageous. In support of this contention the defendant cites the unpublished opinion in *Quatrine v. Shell Oil Corp.*, 848 F.2d 193 (6th Cir.1988).[1] In *Quatrine* the Sixth Circuit, addressing the issue of whether a defendant's conduct was outrageous, stated that it did "not necessarily endorse ... [a] 'sum of the parts' method of analysis." We do not consider this somewhat ambiguous statement, found in an unpublished opinion of limited precedential value, to be persuasive.

Further, having concluded that the "check incidents," even standing alone, suffice to constitute outrageous conduct, and without which the conduct would not have been outrageous, we need not consider it.

### 2. *Plaintiff's Emotional Distress.*

■ The defendant also contends that the evidence at trial was insufficient to support the jury's finding that the plaintiff suffered severe emotional distress. The plaintiff testified that as a result of the defendant's conduct she suffered insomnia, nervousness, and "paranoia" at work. She further testified that she believed that her response to the stress at work contributed to the ultimate breakup of her marriage. In *Tidelands, supra,* the Texas Court of Appeals held that insomnia and inability to concentrate constituted sufficient evidence to support a claim for intentional infliction of severe emotional distress. Under Texas law, therefore, the evidence on this Texas law claim was sufficient to warrant sending the plaintiff's case to the jury.

1. In the Sixth Circuit, under Local Rule 24, a party may cite an unpublished opinion only in "specific situations" recognized in that Rule. Additionally, when citing a case subject to this Rule a party must attach a copy of the opinion that includes the Sixth Circuit's statement limiting the precedential value of the case. The defendant in today's case failed, presumably inadvertently, to comply with this Rule.

Given the evidence in this case, reasonable men could have reached different conclusions about whether the defendant's conduct was outrageous or whether the plaintiff suffered severe emotional distress. The district court, therefore, properly denied the defendant's motion for a directed verdict and for judgment n.o.v.

### III. Cross–Appeal—The Plaintiff's "Failure-to-Promote" Claim.

The plaintiff raised two Title VII claims: failure to promote and retaliatory discharge. These claims were tried before the district court. The court entered findings of fact and conclusions of law on these claims that "defendant is entitled to judgment on the claim for retaliatory discharge." The plaintiff contends that the trial court erred in failing to address her failure-to-promote claim. The plaintiff requests, therefore, that we vacate the judgment on the Title VII claim and remand for the district court to make findings on this issue.

"Normally when a trial court fails to make findings and an appeal is taken, the appellate court will vacate the judgment and remand the action for appropriate findings to be made on the material issues.... [C]ursory findings and conclusions or even the complete lack of findings and conclusions, [however] does not necessarily require a reversal of the judgment if a full understanding of the issues on appeal can nevertheless be determined by the appellate court." *Matter of Texas Extrusion Corp.*, 836 F.2d 217 (5th Cir.1988) (citations omitted).

In this case the district court found that a woman was employed in the collection department at the time that the plaintiff requested a transfer. The district court also found that the plaintiff would have been discharged despite her requests for promotions. It is apparent that if the district court found that the defendant had grounds to fire the plaintiff it also had grounds to refuse to promote her. We, therefore, see no need to remand for further findings on this issue.

The judgment of the district court is AFFIRMED.

E. GRADY JOLLY, Circuit Judge, specially concurring:

I concur in the result reached in this case because the conduct of the employer in attempting to set up a *totally innocent* employee as a target for a *criminal* charge, simply because she opposed a blatantly illegal employment practice, is so outrageous and extremely rare, that I do not consider this opinion to open the door for a body of new law in the workplace. If I thought so, I would not extend this nascent cause of action into the field of employee-employer relations. If it were to be done, I would let the Texas courts do it.