Richard E. WILSON, Plaintiff–Appellee,

v.

MONARCH PAPER COMPANY, the Unisource Corporation, and Alco Standard Corporation, Defendants–Appellants.

No. 89–2293.

United States Court of Appeals, Fifth Circuit.

Aug. 16, 1991.

A. Martin Wickliff, Jr., Matthew Luke Hoeg, Mayor, Day & Caldwell, Houston, Tex., George P. Parker, Jr., Dennis P. Duffy, Matthews & Branscomb, San Antonio, Tex., for defendants-appellants.

W. Carl Jordan, Robert L. Ivey, Vinson & Elkins, Houston, Tex., for amicus—Texas Employment Law Council.

Henri–Ann Nortman, Stanley E. Williams, Houston, Tex., for plaintiff-appellee.

Before REYNALDO G. GARZA, JOLLY and JONES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this employment discrimination case, Monarch Paper Company, *et al.*, appeals a $3,400,000 jury verdict finding it liable for age discrimination and retaliation under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, and for intentional infliction of emotional distress under Texas state law. Monarch challenges the sufficiency of the evidence. It also challenges the district court's denial of their motions for directed verdict, for judgment *non obstante veredicto* (JNOV), for new trial, and for remittitur. Upon review of the entire record, we affirm.

I

Because Monarch is challenging the sufficiency of the evidence, the facts are recited in the light most favorable to the jury's verdict. In 1970, at age 48, Richard E. Wilson was hired by Monarch Paper Company. Monarch is an incorporated division of Unisource Corporation, and Unisource is an incorporated group of Alco Standard Corporation. Wilson served as manager of the Corpus Christi division until November 1, 1977, when he was moved to the corporate staff in Houston to serve as "Corporate Director of Physical Distribution." During that time, he routinely received merit raises and performance bonuses. In 1980, Wilson received the additional title of "Vice President." In 1981, Wilson was given the additional title of "Assistant to John Blankenship," Monarch's President at the time.

While he was Director of Physical Distribution, Wilson received most of his assignments from Blankenship. Blankenship always seemed pleased with Wilson's performance and Wilson was never reprimanded or counseled about his performance. Blankenship provided Wilson with objective performance criteria at the beginning of each year, and Wilson's bonuses at the end of the year were based on his good performance under that objective criteria. In 1981, Wilson was placed in charge of the completion of an office warehouse building in Dallas, the largest construction project Monarch had ever undertaken. Wilson successfully completed that project within budget.

In 1981, Wilson saw a portion of Monarch's long-range plans that indicated that Monarch was presently advancing younger persons in all levels of Monarch management. Tom Davis, who was hired as Employee Relations Manager of Monarch in 1979, testified that from the time he started to work at Monarch, he heard repeated references by the division managers (including Larry Clark, who later became the Executive Vice President of Monarch) to the age of employees on the corporate staff, including Wilson.

In October 1981, Blankenship became Chairman of Monarch and Unisource brought in a new, 42–year–old president from outside the company, Hamilton Bisbee. An announcement was made that Larry Clark would be assuming expanded responsibilities in physical distribution.

According to the defendants, one of Blankenship's final acts as President was to direct Clark (who was in his mid-forties at the time) to assume expanded responsibility for both the operational and physical distribution aspects of Monarch.

When Bisbee arrived at Monarch in November 1981, Wilson was still deeply involved in the Dallas construction project. Richard Gozon, who was 43 years old and the President of Unisource, outlined Blankenship's new responsibilities as Chairman of the company and requested that Blankenship, Bisbee, Wilson, and John Hartley of Unisource "continue to work very closely together on the completion of the Dallas project." Bisbee, however, refused to speak to Wilson or to "interface" with him. This "silent treatment" was apparently tactical; Bisbee later told another Monarch employee, Bill Shehan, "if I ever stop talking to you, you're dead." Shehan also testified that at a meeting in Philadelphia at about the time Bisbee became President of Monarch, Gozon told Bisbee, "I'm not telling you that you have to fire Dick Wilson. I'm telling you that he cannot make any more money."

As soon as the Dallas building project was completed, Bisbee and Gozon intensified an effort designed to get rid of Wilson. On March 8, 1982, Gozon asked for Bisbee's recommendations on how to remove Wilson from the Monarch organization. On March 9, 1982, Bisbee responded with his recommendation that Wilson be terminated, and that any salary continuance to Wilson be discontinued should Wilson elect to pursue an adversarial role toward Monarch. Gozon then asked the Unisource Employee Relations Manager, John Snelgrove, to meet with Wilson with the goal of attempting to convince Wilson to quit.

During the same time frame, Bisbee was preparing a long-range plan for Monarch, in which he made numerous references to age and expressed his desire to bring in "new blood" and to develop a "young team." This long-range plan was transmitted to Gozon, who expressed no dissatisfaction with the goals Bisbee had set out in the plan. In the meantime, Bisbee and Clark began dismantling Wilson's job by removing his responsibilities and assigning them to other employees. Clark was also seen entering Wilson's office after hours and removing files.

Blankenship was diagnosed with cancer in February 1982. In March 1982, Wilson was hospitalized for orthopedic surgery. Immediately after Blankenship's death in June 1982, Bisbee and Snelgrove gave Wilson three options: (1) he could take a sales job in Corpus Christi at half his pay; (2) he could be terminated with three months' severance pay; or (3) he could accept a job as warehouse supervisor in the Houston warehouse at the same salary but with a reduction in benefits. The benefits included participation in the management bonus plan, and the loss of the use of a company car, a company club membership, and a company expense account.

Wilson accepted the warehouse position. Wilson believed that he was being offered the position of Warehouse Manager, the only vacant position in the Houston warehouse at the time. When Wilson reported for duty at the warehouse on August 16, 1982, however, he was placed instead in the position of an entry level supervisor, a position that required no more than one year's experience in the paper business. Wilson, with his thirty years of experience in the paper business and a college degree, was vastly overqualified and overpaid for that position.

Soon after he went to the warehouse, Wilson was subjected to harassment and verbal abuse by his supervisor, Operations Manager and Acting Warehouse Manager Paul Bradley (who had previously been subordinate to Wilson). Bradley referred to Wilson as "old man" and admitted posting a sign in the warehouse that said "Wilson is old." In Bradley's absence, Wilson was placed under the supervision of a man in his twenties. Finally, Wilson was further demeaned when he was placed in charge of housekeeping but was not given any employees to assist him in the housekeeping duties. Wilson, the former vice-president and assistant to the president, was thus reduced finally to sweeping the

floors and cleaning up the employees' cafeteria, duties which occupied 75 percent of his working time.

In the late fall of 1982, Wilson began suffering from respiratory problems caused by the dusty conditions in the warehouse and stress from the unrelenting harassment by his employer. On January 6, 1983, Wilson left work to see a doctor about his respiratory problems. He was advised to stay out of a dusty environment and was later advised that he had a clinically significant allergy to dust. Shortly after January 6, 1983, Wilson consulted a psychiatrist who diagnosed him as suffering from reactive depression, possibly suicidal, because of on-the-job stress. The psychiatrist also advised that Wilson should stay away from work indefinitely.

Wilson filed an age discrimination charge with the EEOC in January 1983. Although he continued being treated by a psychiatrist, his condition deteriorated to the point that in March 1983, he was involuntarily hospitalized with a psychotic manic episode. Prior to the difficulties with his employer, Wilson had no history of emotional illness.

Wilson's emotional illness was severe and long-lasting. He was diagnosed with manic-depressive illness or bipolar disorder. After his first hospitalization for a manic episode, in which he was locked in a padded cell and heavily sedated, he fell into a deep depression. The depression was unremitting for over two years and necessitated an additional hospital stay in which he was given electroconvulsive therapy (shock treatments). It was not until 1987 that Wilson's illness began remission, thus allowing him to carry on a semblance of a normal life.

## II

On February 27, 1984, Wilson filed suit against the defendants, alleging age discrimination and various state law tort and contract claims. The defendants filed a counterclaim, seeking damages in excess of $10,000 for libel and slander, but later dismissed it.[1] Before trial, the district court dismissed one of Wilson's claims on the basis of factual or legal insufficiency. The court also dismissed his emotional distress claim to the extent that "the alleged conduct occurred in the administration of [defendants'] disability plan" on grounds of ERISA preemption. On November 30 and December 28, 1988, the case was tried before a jury on Wilson's remaining claims that the defendants (1) reassigned him because of his age; (2) intentionally inflicted emotional distress; and (3) terminated his long-term disability benefits in retaliation for filing charges of age discrimination under the Age Discrimination in Employment Act (ADEA).

The district court denied the defendants' motions for directed verdict. The jury returned a special verdict in favor of Wilson on his age discrimination claim, awarding him $156,000 in damages, plus an equal amount in liquidated damages. The jury also found in favor of Wilson on his claim for intentional infliction of emotional distress, awarding him past damages of $622,359.15, future damages of $225,000, and punitive damages of $2,250,000. The jury found in favor of the defendants on Wilson's retaliation claim. The district court entered judgment for $3,409,359.15 plus prejudgment interest. The district court denied the defendants' motions for judgment NOV, new trial, or, alternatively, a remittitur. The defendants appeal.

---

1. Over the defendants' objection, Wilson introduced evidence that the defendants had filed the counterclaim, and Wilson's attorney argued to the jury that the filing of the counterclaim should be considered in determining whether the defendants engaged in outrageous conduct. The defendants argue that the district court's refusal to exclude such evidence was reversible error because "a defendant is never liable [for intentional infliction of emotional distress] where he has done no more than to insist upon his legal rights in a permissible way, even

though he is well aware that such insistence is certain to cause emotional distress." Restatement (Second) of Torts § 46, comment g. The defendants state that there is no evidence that the allegations of the counterclaim were factually or legally deficient or that it was filed in bad faith. Because the district court has broad discretion in evidentiary matters, we find no abuse in admitting the counterclaim into evidence because it is arguable whether the pleading was asserted in good faith.

### III

Monarch raises three issues, each attacking the district court's exercise of discretion in sending the case to the jury and entering judgment on its verdict. First, Monarch argues that the district court erred in denying its motions for directed verdict, JNOV, and new trial on Wilson's claim for intentional infliction of emotional distress. Second, Monarch argues that the district court erred in denying its similar motions on Wilson's age discrimination claim. Finally, Monarch argues that the district court erred in denying its motions for directed verdict, JNOV, new trial, and remittitur with respect to the amount of back pay awarded on the age discrimination claim. With respect to the emotional distress claim, neither the quantum of actual damages or the award of punitive damages are appealed.

The standard of review for motions for directed verdict and for JNOV was succinctly set out in *Boeing Co. v. Shipman*, where the court established that

> the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

411 F.2d 365, 374 (5th Cir.1969) (*en banc*). With these parameters in mind, we address each of Monarch's arguments.

### A

■ Wilson's claim for intentional infliction of emotional distress is a pendent state law claim. As such, we are bound to apply the law of Texas in determining whether the defendant's motions should have been granted. The Texas Supreme Court has not expressly recognized the tort of intentional infliction of emotional distress. *Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931, 939 (Tex.), *cert. denied*, 449 U.S. 1015, 101 S.Ct. 575, 66 L.Ed.2d 474 (1980) and *Harned v. E–Z Fin. Co.*, 151 Tex. 641, 254 S.W.2d 81 (1953). We, however, have nonetheless recognized on at least two prior occasions, *see, e.g., Blankenship v. Kerr County*, 878 F.2d 893, 898 (5th Cir.1989) and *Dean v. Ford Motor Credit Co.*, 885 F.2d 300 (5th Cir. 1989), that such a cause of action exists in Texas, based on the Texas Court of Appeals' decision in *Tidelands Auto. Club v. Walters*, 699 S.W.2d 939 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.).[2] To prevail on a claim for intentional infliction of emotional distress, Texas law requires that the following four elements be established:

(1) that the defendant acted intentionally or recklessly;

(2) that the conduct was 'extreme and outrageous';

(3) that the actions of the defendant caused the plaintiff emotional distress; and

(4) that the emotional distress suffered by the plaintiff was severe.

*Dean*, 885 F.2d at 306 (quoting *Tidelands*, 699 S.W.2d at 942). The sole issue before us is whether Monarch's conduct was "extreme and outrageous."

### (1)

"Extreme and outrageous conduct" is an amorphous phrase that escapes precise definition. In *Dean v. Ford Motor Credit Co.*, *supra*, however, we stated that

**2.** The court in *Tidelands* affirmed the plaintiff's damage award on the sole basis of a claim for intentional infliction of emotional distress. 699 S.W.2d at 940. In *Blankenship*, we reasoned that *"Tidelands* bases its conclusions on a thorough analysis of Texas law, and we see no reason to believe that the Texas Supreme Court, after having expanded recovery for emotional distress in *Garrard*, would refuse to follow it." 878 F.2d at 898 (*citing St. Elizabeth Hospital v. Garrard*, 730 S.W.2d 649 (Tex.1987)).

[l]iability [for outrageous conduct] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.... Generally, the case is one in which a recitation of the facts to an average member of the community would lead him to exclaim, "Outrageous."

885 F.2d at 306 (citing Restatement (Second) Torts § 46, Comment d (1965)). The Restatement also provides for some limits on jury verdicts by stating that liability "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.... There is no occasion for the law to intervene in every case where someone's feelings are hurt." Rest. (Second) of Torts § 46.

The facts of a given claim of outrageous conduct must be analyzed in context, and ours is the employment setting. We are cognizant that "the work culture in some situations may contemplate a degree of teasing and taunting that in other circumstances might be considered cruel and outrageous." *Keeton, et al., Prosser & Keeton on Torts* (5th ed. 1984 & 1988 Supp.). We further recognize that properly to manage its business, every employer must on occasion review, criticize, demote, transfer, and discipline employees. *Id.* We also acknowledge that it is not unusual for an employer, instead of directly discharging an employee, to create unpleasant and onerous work conditions designed to force an employee to quit, i.e., "constructively" to discharge the employee. In short, although this sort of conduct often rises to the level of illegality, except in the *most* unusual cases it is not the sort of conduct, as deplorable as it may sometimes be, that constitutes "extreme and outrageous" conduct.

### (2)

Our recent decision in *Dean v. Ford Motor Credit Co., supra,* is instructive in determining what types of conduct in the employment setting will constitute sufficiently outrageous conduct so as to legally support a jury's verdict. In *Dean,* the plaintiff presented evidence that (1) when she expressed interest in transferring to a higher paying position in the collection department, she was told that "women don't usually go into that department"; (2) she was denied a transfer to the collection department, and a lesser qualified man was selected; (3) the defendant's attitude toward the plaintiff changed after she complained about alleged discriminatory treatment; (4) management began to transfer her from desk to desk within the administrative department; (5) a coworker testified she believed management was trying to "set ... [the plaintiff] up"; (6) she was called upon to do more work than the other clerks "and subjected to unfair harassment"; and (7) management used "special" annual reviews (that only the plaintiff received) to downgrade her performance. 885 F.2d at 304–305, 306–307. Far more significant to the claim for intentional infliction of emotional distress, however, (8) the plaintiff proved that a supervisor, who had access to the employer's checks, intentionally placed checks in the plaintiff's purse in order to make it appear that she was a thief, or to put her in fear of criminal charges for theft. *Id.* We expressly held that the "check incidents" were "precisely what [took] this case beyond the realm of an ordinary employment dispute and into the realm of an outrageous one." *Id.* at 307. We concluded that without the "check incidents" the employer's conduct "would not have been outrageous." *Id.*

Wilson argues that Monarch's conduct is sufficiently outrageous to meet the *Dean* standard; in the alternative, he argues that Monarch's actions are certainly more outrageous than the conduct in *Bushell v. Dean,* 781 S.W.2d 652 (Tex.App.—Austin 1989), writ denied in part, rev'd in part on other grounds, 803 S.W.2d 711 (Tex.1991), which is a recent pronouncement by the Texas courts on the subject.[3] Monarch contends that Wilson's evidence of out-

---

3. Wilson contends that *Dean* "is not the final word on this cause of action," and urges us to

follow *Bushell.* There, an employee was awarded damages against her employer for sexual

rageous conduct, that is, his reassignment to a job he did not like, his strained relationship with the company president, and isolated references to his age, is the same evidence that he used to prove his age discrimination claim. According to Monarch, unless all federal court discrimination lawsuits are to be accompanied by pendent state law claims for emotional distress, this court must make it clear that ordinary employment disputes cannot support an emotional distress claim.[4] We agree with Monarch that more is required to prove intentional infliction of emotional distress than the usual ADEA claim. *Accord Dean, supra.*

### (3)

In *Dean,* we found that the "check incidents" took the case beyond an ordinary

harassment and intentional infliction of emotional distress. During a four-month period, the employer occasionally bought small items for the employee and paid attention to her in other ways, such as making complimentary comments about her clothing and the shape of her body. He touched her several times, rubbing her neck on one occasion, and poking her in the ribs once or twice. He told her that he loved her and desired a sexual encounter. After the employee spurned his advances, the employer became much more formal, and assigned her more demanding duties. After she had "endured almost two weeks" of the employer's retaliation, the employee quit after the employer shouted at her when she informed him that she had heard of a possible trucker's strike against the company. The jury returned a verdict for the plaintiff on the issue of intentional infliction of emotional distress. The Court of Appeals affirmed, holding that "the jury's determination that Bushell's conduct was outrageous is not so against the great weight and preponderance of the evidence as to be manifestly unjust." 781 S.W.2d at 658.

It is arguable that *Bushell* accepted a lower threshold of actionable conduct as "extreme and outrageous" under Texas law, although the particular facts of the case, i.e., sexual harassment, may by their very nature account in part for the court's holding. Both parties have extensively briefed and argued whether *Bushell* is binding on this court, especially given our views expressed in *Dean.* However, because we find that Monarch's conduct is actionable under *Dean,* we need not resolve the differences between *Dean* and *Bushell.*

**4.** Monarch presents a lengthy citation of cases from other jurisdictions that have, according to it, rejected similar conduct as being not out-

discrimination case and supported the claim of infliction of emotional distress. Wilson contends that Monarch's conduct was equally outrageous as the "check incidents" in *Dean.* Generally, Wilson argues that an average member of the community would exclaim "Outrageous!" upon hearing that a 60–year–old man, with 30 years of experience in his industry, was subjected to a year-long campaign of harassment and abuse because his company wanted to force him out of his job as part of its expressed written goal of getting rid of older employees and moving younger people into management. More precisely, Wilson argues that substantial evidence of outrageous conduct supports the jury's verdict, including: (1) his duties in physical distribution were assigned to a younger person; (2) Bisbee deliberately refused to

rageous. *See, e.g., Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (racial harassment and increased work load falls far short of constituting outrageous conduct under North Carolina law); *Mundy v. Southern Bell Tel. & Tel. Co.,* 676 F.2d 503 (11th Cir.1982) (transfer to less desirable job, inaccurate and unsupported negative evaluations, and attempts to damage employee's credibility not outrageous under Florida law); *Murphy v. American Home Prod. Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (Ct.App. 1983) (job transfer, discharge and forcible removal from employer's premises, and dumping employee's personal belongings in the street not sufficient egregious conduct under New York law to support finding of outrageous conduct).

All of the states that have adopted this tort have relied on the elements in § 46 of the Restatement (Second) of Torts, however, the minimum standard of proof required to establish extreme and outrageous conduct is significantly different from state to state. *See* Givelber, *The Right to Minimum Social Decency and the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct,* 82 Colum.L.Rev. 42 (1982); Austin, *Employer Abuse, Worker Resistance, and the Tort of Intentional Infliction of Emotional Distress,* 41 Stan.L. Rev. 1 (1988). In fact, a survey of the numerous reported cases from various jurisdictions that address the intentional infliction of emotional distress tort reveals widely disparate standards among the various states that recognize this tort. Nevertheless, even if these cases are similar to the facts of our case, or even if they reject claims based on more egregious conduct than Monarch's, they are all based on the law of other jurisdictions, and therefore not controlling in the resolution of this case.

speak to him in the hallways of Monarch in order to harass him; (3) certain portions of Monarch's long-range plans expressed a desire to move younger persons into sales and management positions; (4) Bisbee wanted to replace Wilson with a younger person; (5) other managers within Monarch would not work with Wilson, and he did not receive his work directly from Bisbee; (6) he was not offered a fully guaranteed salary to transfer to Corpus Christi; (7) he was assigned to Monarch's Houston warehouse as a supervisor, which was "demeaning"; (8) Paul Bradley, the Warehouse Manager, and other Monarch managers, referred to Wilson as old; (9) Bradley prepared a sign stating "Wilson is old" and, subsequently, "Wilson is a Goldbrick"; and (10) Monarch filed a counterclaim against Wilson in this action. We are not in full agreement.

Most of Monarch's conduct is similar in degree to conduct in *Dean* that failed to reach the level of outrageousness. We hold that all of this conduct, except as explicated below, is within the "realm of an ordinary employment dispute," *Dean*, 885 F.2d at 307, and, in the context of the employment milieu, is not so extreme and outrageous as to be properly addressed outside of Wilson's ADEA claim.

### (4)

■ Wilson argues, however, that what takes this case out of the realm of an ordinary employment dispute is the degrading and humiliating way that he was stripped of his duties and demoted from an executive manager to an entry level warehouse supervisor with menial and demeaning duties. We agree. Wilson, a college graduate with thirty years experience in the paper field, had been a long-time executive at Monarch. His title was Corporate Director of Physical Distribution, with the added title of Vice–President and Assistant

to the President. He had been responsible for the largest project in the company's history, and had completed the project on time and under budget. Yet, when transferred to the warehouse, Wilson's primary duty became housekeeping chores around the warehouse's shipping and receiving area. Because Monarch did not give Wilson any employees to supervise or assist him, Wilson was frequently required to sweep the warehouse. In addition, Wilson also was reduced to cleaning up after the employees in the warehouse cafeteria after their lunch hour. Wilson spent 75 percent of his time performing these menial, janitorial duties.

Monarch argues that assigning an executive with a college education and thirty years experience to janitorial duties is not extreme and outrageous conduct. The jury did not agree and neither do we. We find it difficult to conceive a workplace scenario more painful and embarrassing than an executive, indeed a vice-president and the assistant to the president, being subjected before his fellow employees to the most menial janitorial services and duties of cleaning up after entry level employees: the steep downhill push to total humiliation was complete. The evidence, considered as a whole, will fully support the view, which the jury apparently held, that Monarch, unwilling to fire Wilson outright, *intentionally and systematically* set out to humiliate him in the hopes that he would quit.[5] A reasonable jury could have found that this employer conduct was intentional and mean spirited, so severe that it resulted in institutional confinement and treatment for someone with no history of mental problems. Finally, the evidence supports the conclusion that this conduct was, indeed, so outrageous that civilized society should not tolerate it. *Dean*, 885 F.2d at 307.[6] Accordingly, the judgment of the

---

**5.** Nevertheless, we are not unaware of the irony in this case: if Monarch had chosen only to fire Wilson outright, leaving him without a salary, a job, insurance, etc., it would not be liable for intentional infliction of emotional distress. There is some suggestion in the record, however, that Monarch was unwilling to fire Wilson outright because it had no grounds and perhaps

feared a lawsuit. Although Monarch was willing to accept Wilson's resignation, Wilson was unwilling to resign. Once he was unwilling to resign, the evidence supports the inference that Monarch's efforts intensified to force his resignation.

**6.** We suppose that the threat of an emotional distress claim also provides the irony of "civiliz-

district court in denying Monarch's motions for directed verdict, JNOV and a new trial on this claim is affirmed.[7]

B

■ Monarch next contends that it was entitled to a directed verdict or JNOV on the age discrimination claim. The parties differ on the burdens and elements for proof of discrimination: Monarch argues that this case is governed by the evidentiary standards of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), requiring Wilson to prove that Monarch's proffered justifications for its actions were pretextual. Wilson, on the other hand, argues that this case was submitted to the jury as a "mixed motives" case in accordance with *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 1787–88, 104 L.Ed.2d 268 (1989), effectively shifting the burden on Monarch to prove a non-discriminatory discharge. The evidentiary burden-shifting issue notwithstanding, now that the case has been fully submitted to and decided by the jury, we only will consider Monarch's challenge as one attacking the sufficiency of the evidence that Monarch discriminated against Wilson on the basis of age. Accordingly, we must only decide whether there was enough evidence presented to allow reasonable and fair jurors to disagree on the question of age discrimination. *Boeing Co. v. Shipman, supra.*

Wilson presented the following evidence supporting a finding of discrimination: Bisbee's statement that he wanted a younger man in Wilson's job; the skill development profile of Wilson prepared by Bill Kirby and provided to Gozon that contained a reference to Wilson's age; age-related statements about Wilson made by Larry Clark and other division managers (all of whom were over 40 years old); and Bisbee's long-range plan containing age-related references. Monarch's policy of "bringing in new blood" also provides evidence that age was a factor in its decision to reassign Wilson. Additionally, younger men were in fact given Wilson's responsibilities as Monarch slowly eliminated Wilson's job through a process of attrition. Furthermore, Wilson points to the following circumstantial evidence of age discrimination: there was no effort to offer constructive criticism of his deficiencies before demoting him—indeed, there was no specific criticism of any kind made to him about his work performance before his demotion, only "you are not the man for the job" type of complaint; the state of isolation in which Wilson was placed; the manner in which his job duties were taken away; the ruse of "job elimination"; and the severity of the demotion.

Monarch counters that Gozon, the person solely responsible for Wilson's reassignment, articulated four legitimate, nondiscriminatory reasons for his decision: (1) the "evolutionary reorganization" of Monarch's operations; (2) Wilson's continuing inadequate job performance as Director of Physical Distribution; (3) Gozon foresaw Monarch entering into a difficult economic climate; and (4) Blankenship's death left Wilson without anyone to assist.

The jury heard both sides and the jury spoke. That is about all there is to say about age discrimination liability in this case. There were clearly two sides to this case. The jury believed Wilson and his evidence; it did not believe Gozon and Monarch.[8] Consequently, the jury's verdict on age discrimination is affirmed.

---

ing" discrimination; or stated differently, employers will have to behave like ladies and gentlemen when discriminating.

7. Monarch also argues that the tort of intentional infliction of emotional distress has been preempted by the ADEA's refusal to permit punitive damages. Because this argument was not preserved for appeal, we leave the resolution of this issue for another day.

8. The jury was instructed, *without objection*, on the age discrimination claim as follows:

In order for you to find for the Plaintiff, you must find from all of the evidence that the Plaintiff's age was a determining factor in the decision of the defendants, that is, that Defendants would not have reassigned Plaintiff except for his age. However, Plaintiff's age need not have been the only reason.

## C

■ Finally, Monarch argues that Wilson should not have been awarded $156,000 in back pay, plus an equal amount in liquidated damages.[9]  Generally, a jury's assessment of damages is "entitled to considerable deference," *Enterprise Ref. Co. v. Sector Ref. Inc.*, 781 F.2d 1116, 1118 (5th Cir.1986), and "uncertainty in determining what an employee would have earned but for discrimination should be resolved against the employer." *Carter v. Shop Rite Foods, Inc.*, 503 F.Supp. 680, 687 (N.D.Tex.1980) (citing, *inter alia, United States v. United States Steel Corp.*, 520 F.2d 1043, 1050 (5th Cir.1975)).  However, an age discrimination plaintiff "has the burden of placing evidence in the record affording reasonable support for the sums found," and a " 'jury may not render a verdict based on speculation or guesswork.' "  *Kolb v. Goldring, Inc.*, 694 F.2d 869 (1st Cir.1982) (citing *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946)).

### (1)

The record shows that Wilson presented two theories of discrimination to the jury:
(1) that he was discriminatorily reassigned, which ultimately resulted in his inability to work;[10] and (2) that Monarch retaliated against him for filing charges of discrimination by terminating his Long Term Disability ("LTD") benefits.[11]  Moreover, the jury was instructed that if it found that Monarch discriminated against Wilson under either or both of the above theories, that it could award both front and back pay.  The jury found for Wilson on his discriminatory reassignment claim.  However, the jury found for Monarch on Wilson's claim of retaliatory denial of LTD benefits.

### (2)

Monarch first contends, as a matter of law, that Wilson was not entitled to back pay for any part of the period after he left work because no issue was presented to the jury on whether he was discharged or constructively discharged.  In the alternative, Monarch argues that if constructive discharge was presented to the jury, it was presented only under the theory that Monarch terminated Wilson's LTD benefits.

---

Although the instruction is somewhat ambiguous as to whether it instructed the jury under the *Burdine* or *Price Waterhouse* standard.  We find the evidence was sufficient for the jury to find in favor of Wilson under this instruction.

9.  A finding of willfulness entitles the plaintiff to liquidated damages under the ADEA. *Hansard v. Pepsi–Cola Metropolitan Bottling Co.*, 865 F.2d 1461, 1470 (5th Cir.1989).

10.  The jury, *without objection*, was given the following instruction on the discriminatory reassignment claim:

If you find that the Defendants reassigned the Plaintiff on the basis of his age, then you must determine the amount of back pay that the Plaintiff lost.

Back pay is an amount equal to the pay that Plaintiff would have received from the Defendant had he not been reassigned, from the time that he was reassigned until the date of trial.  You should deduct from this sum whatever wages the Plaintiff has obtained from other employment during this period.

If Defendants prove the Plaintiff unjustifiably failed to take a new job of like kind, status and pay which was available to him, or failed to make reasonable effects to find a new job, you should also subtract from his back pay any amount he could have earned in a new job after his reassignment.

11.  The jury was instructed, *without objection*, as to the termination of LTD benefits that:

In this case, the Plaintiff also claims that the Defendant retaliated against him by terminating his receipt of long-term disability ("LTD") benefits because he filed charges of discrimination and/or this lawsuit against Defendants.

Under federal law, it is unlawful for an employer to retaliate against any employee because of that employee's filing of charges of discrimination or of a lawsuit alleging discrimination.

More specifically, the Plaintiff alleges that Defendants terminated his receipts of LTD benefits in July 1985, in retaliation for his filing of charges of discrimination in 1983 and/or his filing of this lawsuit.

The Defendants deny Plaintiff's claims, and contend that Plaintiff's LTD benefits were terminated in accordance with the applicable LTD Plan because the results of an independent medical examination conducted by a physician selected by the insurance company administering the LTD Plan indicated that Plaintiff did not qualify for continuing LTD benefits.

Accordingly, because the jury found for Monarch on this claim, Wilson is only entitled to the difference in pay between his former position and the warehouse position to which he was reassigned. Monarch then argues that the evidence conclusively established that Wilson enjoyed the same salary and most of the same benefits after his reassignment, thus making the award punitive. Monarch points out that the only monetary loss Wilson suffered was part of a bonus; although Wilson also lost the use of a company car, a company club membership, and a company-paid expense account, Monarch argues that these benefits were non-monetary and non-compensable. *See, e.g., Kolb v. Goldring, Inc.,* 694 F.2d at 872–875 (holding that non-monetary benefits in the form of club memberships or use of company car are not compensable). Monarch concludes that the district court therefore erred in denying its motions for new trial, JNOV or remittitur on the age discrimination award.

On the contrary, Wilson contends that he is entitled to back pay from the date of his reassignment because Monarch's discriminatory conduct caused his inability to work, which amounts to a constructive discharge. According to Wilson, the jury instruction on his theory of discriminatory reassignment, which was not objected to by Monarch, supports the jury's award of damages.

## (3)

Because Monarch did not object to the jury instructions on front and back pay, its challenge on appeal is limited to the sufficiency of the evidence supporting the jury's verdict. We therefore view the evidence in favor of that verdict, drawing all reasonable inferences that would support it. The evidence establishes conclusively that Monarch was attempting to force Wilson to resign by reassigning him to the warehouse. The evidence is uncontroverted that once transferred, Wilson developed a medically significant allergy to the dust in the warehouse, and was ordered by his physician not to return to that environment. Moreover, by this time, Monarch's intentional and systematic humiliation of

Wilson had achieved its intended effects: he was permanently off the active payroll of Monarch.

The jury was not only presented with evidence of constructive discharge, the jury was also instructed in language that clearly permits such a finding. The instructions, which were not objected to, expressly allowed the jury to award both front and back pay from the time of the reassignment until the time of trial if it found Monarch liable for discriminatory reassignment; the instructions, in so many words, speak of Wilson's obligation to mitigate back pay by finding other work. Thus, the jury instructions, taken as a whole, contemplate that an issue in the case is Monarch's liability for Wilson's joblessness.

Based upon the evidence that was presented to the jury, the unobjected to arguments made by Wilson's counsel in closing arguments, the unobjected to wording of the jury instructions, and the fact that the jury returned substantial damages beyond the mere loss of benefits, we conclude that the jury found, as it was entitled to find, that Wilson was involuntarily terminated and rendered jobless by a condition directly caused by the discriminatory conduct of Monarch. The jury's verdict is only consistent with such a conclusion.

Surely, there is no need for us to once again cite the evidence, replete in this opinion, that supports the jury's finding that the discrimination was willful.

■ In sum, because we find that the jury could have concluded that Wilson was constructively discharged by Monarch's actions, back pay and front pay were properly available. Both parties presented expert testimony concerning the amount of back-pay damages Wilson suffered. The jury appears to have chosen a number that was between the two figures proffered by the experts. Because we find that the jury properly could conclude that Wilson was constructively discharged in January 1983, the district court did not err in denying Monarch's post-trial motions. *See United States v. An Article of Drug Consisting of*

*4,680 Pails,* 725 F.2d 976, 990 (5th Cir. 1984).

### IV

In conclusion, we express real concern about the consequences of applying the cause of action of intentional infliction of emotional distress to the workplace. This concern is, however, primarily a concern for the State of Texas, its courts and its legislature. Although the award in this case is astonishingly high, neither the quantum of damages, nor the applicability of punitive damages has been appealed.

For the reasons set forth above, the district court's denial of the motions for direct verdict, new trial and JNOV with respect to the intentional infliction of emotional distress verdict is AFFIRMED. The denial of Monarch's motions with respect to the age discrimination and back pay is also AFFIRMED.

AFFIRMED.