United States Court of Appeals
Fifth Circuit

**F I L E D**

April 17, 2007

Charles R. Fulbruge III
Clerk

In the
# United States Court of Appeals
## for the Fifth Circuit

m 06-10320

GARLAN CUNNINGHAM,

Plaintiff-Appellee,

VERSUS

RICHESON MANAGEMENT CORPORATION,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Texas
m 3:04-CV-385

Before SMITH, BARKSDALE, and DENNIS,
Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Garlan Cunningham sued her former employer, Richeson Management Corporation

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

("RMC"), for age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, and for intentional infliction of emotional distress ("i.i.e.d.") under Texas law. A jury gave Cunningham damages on both claims; the district court denied RMC's motion for judgment as a matter of law ("j.m.l.") on the portion of the award based on i.i.e.d. RMC appeals only in regard to the denial of j.m.l. on the i.i.e.d. claim. We vacate and remand.

## I.

Cunningham worked for RMC in various management positions, including, during the time in question, as district manager of the area that included the Dairy Queen store in Gorman, Texas. A month before Cunningham's employment with RMC was terminated, RMC's owner and Chairman of the Board, Doris Richeson, sent a memorandum to Cunningham and a copy to all of RMC's other supervisors. This memo, which serves as the only basis for Cunningham's i.i.e.d. claim,[1] states in full as follows:

Lazy cowboy left in saddle too long

(GRAHAM, TEXAS) §§ You could tell he was a little lazy, just the way he slumped and rocked along in the saddle. His clothes were dirty too, but we wondered whether it was hard work, or just not caring *how* he looked.

His name was Gorman something-or-other, and years back someone had named the horse he called his nag *DQ*.

One thing, he just couldn't seem to round up enough cows to make a difference. Then the boss started noticing there were no checks coming in when Gorman should have been taking cows to market. And items were missing without explanation. And sometimes the other cowboys didn't seem to be working when they were paid to work.

He looked at the stock tank every day as *DQ* strode across the pastures; it was almost dry, just a little murky water left in it. But the cows didn't get sick too often, and when they did, he'd just call the vet. After all, it didn't cost *him* anything, and the boss probably would never know Gorman had spent the money.

Gorman thought *Pumper Daddy* used to be a pumper in the oil field, but these days he just sold a few tools now and then. Gorman never knew exactly where *Pamper Daddy* got the tools, but the boss didn't seem to mind if he got a few now and then. Of course, some of them were just a-layin' out there in the cowshed.

There were rumors, too, about Gorman's family problems. Or maybe they weren't even a family, just a society of fair weather friends.

But nobody did anything about Gorman. Probably didn't want to have to go out and fix the problem. Just let Gorman's nag go wherever he wanted to slog along.

Everyone was so nice. Finally even Gorman got tired of being petted and coddled, and having his chuck wagon meals regular, with plenty of hay and soft feed for poor old DQ. But he didn't really want to go to work and earn his keep.

So Gorman cooked up a scheme with one of his fair weather friends, and just left. Course he knew his paycheck would be coming anyway. But he could go ahead and get that and maybe no work would fall into his life.

Gorman hadn't kept the cows fed and

---

[1] To find that RMC intentionally inflicted emotional distress on Cunningham, the jury considered the memo as the sole evidence. The jury was asked, "By issuing the 'Lazy Cowboy' memo, did Richeson Management intentionally inflict emotional distress on Cunningham?"

worked. He couldn't even remember that a cow needed help to produce offspring, and without offspring, it would be a long winter indeedSSmaybe a couple of them, since the herd had been damaged irreparably. The hay and the feed had to come from *somewhere*. But Gorman would suffer no ill; he'd just be on his way.

This lazy cowboy was left in the saddle too long. Wonder why? Was no one ready to roll up their sleeves and handle the situation? ##

SSDoris Richeson

RMC argues that this memorandum is not extreme and outrageous and thus is insufficient to constitute i.i.e.d. under Texas law, so the district court should have granted j.m.l.

## II.

We review *de novo* the denial of j.m.l., applying the same legal standard used by the district court. *Lubke v. City of Arlington*, 455 F.3d 489, 494 (5th Cir. 2006). A j.m.l. should be granted only if "there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." *Id.* (quotation omitted).

In Texas, "[t]o recover damages for [i.i.e.d.], a plaintiff must establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004). RMC appeals only on the basis that its conduct was not extreme and outrageous. "Extreme and outrageous conduct is conduct 'so outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993) (quotation omitted)).

The Texas Supreme Court has held that a supervisor's constant humiliating and abusive behavior toward an employee constituted extreme and outrageous conduct. In *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 613-17 (Tex. 1999), an employer engaged in "constant humiliating and abusive behavior" and "constantly harassed and intimidated" his employees. *Id.* at 608. "The employees complained about [the supervisor's] daily use of profanity, short temper, and his abusive and vulgar dictatorial manner. The employees complained that, among other offensive acts, [he] repeatedly yelled, screamed, cursed, and even 'charged' at them. In addition, he intentionally humiliated and embarrassed the employees." *Id.* at 608-09. In holding that this conduct was extreme and outrageous, the court relied on the regular pattern of abuse. *Id.* at 617. "Occasional malicious and abusive incidents," on the other hand, "must often be tolerated in our society." *Id.*

In addition to *GTE Southwest*, the other two cases that Cunningham relies on as authority for the claim that RMC's conduct was extreme and outrageous also involved sustained conduct, not one-time incidents. In *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 613 (5th Cir. 1999), we reasoned that conduct was extreme and outrageous in part because the "improper conduct was persistent and long-standing." In *Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1144-45 (5th Cir. 1991), we stated that a substantial demotion following on the heels of "a year-long campaign of harassment and abuse" was

extreme and outrageous. Cunningham argues that in *Wilson* we held specifically that the single incident of demotion was extreme and outrageous. Though our opinion does state that the year of abusive conduct by itself was insufficient under the standard, we did not say that the single act of demoting the plaintiff was sufficient on its own to constitute extreme and outrageous conduct. Our conclusion that the demotion was extreme and outrageous was linked to the year-long campaign of humiliation: With the demotion, "the steep downhill push to total humiliation was complete." *Id.* at 1145.[2]

Especially instructive is the recent, unanimous decision in *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814 (Tex. 2005). The court addressed, *inter alia*, a claim of i.i.e.d. stemming from a post-termination eviction of the plaintiff from the house where she was living, allegedly orchestrated by the defendant employer. The court denied the i.i.e.d. claim with the following explanation:

> Assuming all this was true, it was callous, meddlesome, mean-spirited, officious, overbearing, and vindictiveSSbut not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." . . . Intentional infliction claims cannot be used "to circumvent the limitations placed on the recovery of mental anguish damages under more established tort doctrines."

\* \* \*

> We certainly understand judicial reticence to dismiss claims like this one stemming from heinous acts. But except in circumstances bordering on serious criminal acts, we repeat that such acts will rarely have merit as intentional infliction claims.

*Id.* at 817-18 (footnotes containing citations omitted).

The memorandum sent to Cunningham was a lone incident that is not actionable for i.i.e.d. under Texas law. Cunningham provides no authority that suggests this single memo meets the required exacting standard under Texas law, which supplies the rule of decision in this case.

The judgment is VACATED, and this matter is REMANDED for further proceedings as appropriate.

---

[2] We are not declaring that a single incident can never constitute extreme and outrageous conduct, but only that the single memorandum in this case does not resemble the lengthy patterns of reprehensible conduct evident in *GTE Southwest*, *Skidmore*, and *Wilson*. Those cases do not support Cunningham's position.