# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-30788

LILLIE D. WHEAT,

Plaintiff - Appellant

v.

FLORIDA PARISH JUVENILE JUSTICE COMMISSION,

Defendant - Appellee

United States Court of Appeals
Fifth Circuit

**FILED**
January 5, 2016

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JOLLY and DENNIS, Circuit Judges, and REEVES,* District Judge.

E. GRADY JOLLY, Circuit Judge:

Lillie Wheat, a former Juvenile Detention Staff Officer ("JDS Officer") with the Florida Parishes Juvenile Justice Commission ("the Commission"), appeals from the district court's summary-judgment dismissal of her employment-discrimination suit. We AFFIRM in part, and VACATE and REMAND in part.

I.

In 2000, Wheat began her employment with the Commission, which operates the Florida Parishes Juvenile Detention Center ("FPJDC") in the

---

* District Judge of the Southern District of Mississippi, sitting by designation.

No. 14-30788

Eastern District of Louisiana. Wheat was eventually promoted to JDS officer, then to Shift Supervisor in 2005, and ultimately to Assistant Director of Female Services in 2008. Additionally, she had received positive reviews and consistent pay raises. In January 2005, however, Wheat was disciplined after she used excessive force against a juvenile inmate. By failing to defuse a hostile situation with the juvenile, or alert other JDS officers, Wheat had allowed the juvenile to get within her reach. Wheat then physically forced the juvenile down to the ground and held her there, violating FPJDC's guidelines.

In 2009, Wheat took leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, to undergo surgery. The Commission terminated her employment for failing to return to work after her FMLA leave had expired. She filed suit under the FMLA. The suit was settled, and her employment at the Commission was reinstated on March 8, 2011. At the time, her previous position as Assistant Director of Female Services was not available. Consequently, she was hired at a lower ranking position as a JDS Officer. However, she was paid the same salary as her previous supervisory position. After being rehired, supervisory positions became available and, on two separate occasions, she was offered advancement to a supervisory position. Wheat turned down both offers because "she did not want to go back on salary and assume additional responsibility," and "she would lose her right to overtime."

On November 23, 2011, Wheat filed an "Unusual Occurrence Report" concerning a twelve-year-old female inmate's alleged inappropriate sexual advances toward Wheat. Wheat's supervisors met with her on several occasions to discuss the proper methods for handling such advances. Wheat was dissatisfied with the disciplinary limitations which these models imposed. She requested that the juvenile be placed in administrative segregation. Her requests were denied.

No. 14-30788

On January 3, 2012, Wheat had another physical episode with a female inmate. Responding to the juvenile's noncompliant behavior, Wheat applied a "mandibular angle pressure point" hold to the juvenile. Wheat was ordered to cease, and her supervisor had to restrain her. Wheat then had to be restrained a second time. Wheat followed the same juvenile to her cell, and although provoked by the juvenile, further attempted to assault her. Wheat threatened to "whip that bitch's ass." Wheat was placed on leave, without pay, for these two eruptions and was shortly thereafter discharged, on January 19, 2012.

After exhausting her remedies with the Equal Employment Opportunity Commission (EEOC), *see* 42 U.S.C. § 2000e-5, Wheat filed this suit. In her complaint, she alleged that she was discharged in retaliation for having asserted her rights under the FMLA, and under Title VII (for having complained about the juvenile's sexual advances). She also alleged ten additional retaliatory acts by the Commission, as well as sexual harassment by the juvenile resident. The district court granted summary judgment to the Commission, dismissing Wheat's complaint. *Wheat v. Florida Parishes Juvenile Justice Comm'n*, No. 12-2989, 2014 WL 2155239 (E.D. La. May 22, 2014).

## II.

We review a grant of summary judgment de novo, applying the same standard as did the district court. *E.g., Cuellar v. Keppel Amfels, L.L.C.*, 731 F.3d 342, 345 (5th Cir. 2013). Under that standard, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

It is important to keep in mind that the FPJDC facility is a correctional confinement, primarily for youths who are emotionally challenged, exhibit

3

drug and alcohol problems, mental problems, and suicidal tendencies, which requires supervisors and employees with specialized training and self-control.

The FMLA and Title VII prohibit an employer from discriminating against employees for asserting rights protected under those acts. *See* 29 U.S.C. § 2615 (forbidding "discriminat[ion] against any individual because such individual," among other things, "has filed any charge . . . under or related to" the FMLA); 42 U.S.C. § 2000e-3(a) (forbidding "discriminat[ion] against" an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation).

Wheat does not connect any of the alleged acts of retaliation to a specific protected right, that is, whether the retaliation was under Title VII and/or the FMLA. Retaliation claims under both Title VII and the FMLA, however, are analyzed under the *McDonnell Douglas* burden-shifting framework. *Chaffin v. John H. Carter Co.*, 179 F.3d 316, 319 (5th Cir. 1999); *see also Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 768 (5th Cir. 2001). That framework requires the employee first to set out a prima facie case of retaliation, which she may do by establishing that: (1) she engaged in protected activity; (2) the employer took a materially adverse action against her; and (3) a causal link exists between her protected activity and the adverse action. *See, e.g., Davis v. Fort Bend Cnty.*, 765 F.3d 480, 489–90 (5th Cir. 2014) (Title VII), *cert. denied*, 135 S. Ct. 2804 (2015); *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 390 (5th Cir. 2013) (FMLA). The Supreme Court, however, in *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013), recently held that to satisfy the "causal link" requirement of a Title VII retaliation claim, the employee must provide substantial evidence that "but for" exercising protected rights, she would not have been discharged. *See id*. at 2533 ("Title VII retaliation claims must be proved according to traditional principles of but-for causation .

No. 14-30788

. . [t]his requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."). Neither this Court, nor the Supreme Court, has decided whether the heightened "but for" causation standard required for Title VII retaliation claims applies with equal force to FMLA retaliation claims. *See Harrelson v. Lufkin Indus., Inc.*, No. 14-41458, 2015 WL 3941905, at \*3 (5th Cir. June 29, 2015) ("We have yet to decide whether *Nassar* applies to the FMLA context."); *Castay v. Ochsner Clinic Found.*, 604 F. App'x 355, 356 (5th Cir. 2015) ("Because we concluded that the plaintiff's claim in that case would fail under either [Title VII or FMLA] standard, we did not decide whether the 'but for' causation standard should apply in FMLA retaliation cases."); *Ion*, 731 F.3d at 390 ("We emphasize that we need not, and do not, decide whether *Nassar* 's analytical approach applies to FMLA-retaliation claims and, if so, whether it requires a plaintiff to prove but-for causation."). Even so, however, this distinction is largely immaterial because the claims addressed below—with the exception of the termination and harassment claims—turn on the "materially adverse action" prong of *McDonnell Douglas*.

A.

Wheat alleges that, before her termination, the Commission retaliated against her on several occasions. Reasoning that only "ultimate employment decisions" can constitute actionable retaliation, the district court held that Wheat had failed to make out a prima-facie case. *Wheat*, 2014 WL 2155239 at \*5–8. On appeal, the parties, as well as the EEOC as amicus, argue that the district court erred by applying our pre-*Burlington Northern & Santa Fe Railway v. White*, 548 U.S. 53 (2006), standard to Wheat's claims.[1]

---

[1] Before the Supreme Court's decision in *Burlington Northern & Santa Fe Railway v. White*, 548 U.S. 53 (2006), this Court held that only "'ultimate employment decisions,' such as hiring, granting leave, discharging, promoting, and compensating, satisfy the 'adverse

No. 14-30788

Nonetheless, the Commission argues that it is still entitled to summary judgment because none of the alleged pre-termination actions rises to the level of actionable retaliation under *Burlington*. We turn, then, to determine whether these retaliation claims survive summary judgment under current law.

We have examined these various retaliation claims and find that most are unsupported by the record and are devoid of merit. We do find that three of these claims merit further discussion: the assignment of "janitorial duties" upon her rehiring; the denial of a 4% raise as indicated by her performance evaluation; and the denial of her request to be transferred away from a "difficult inmate."[2]

1.

First, Wheat alleges that an assignment of janitorial duties was a retaliatory, materially adverse action. Such an allegation, however, must do more than make conclusory allegations to create a cognizable issue of fact. *See, e.g.*, *Navarro v. City of San Juan*, No. 14-41410, 2015 WL 5049911, at *3 (5th Cir. Aug. 27, 2015) ("The nonmovant's burden 'is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'") (citation omitted); *Davis*, 765 F.3d at 484 ("A party cannot 'defeat summary judgment

---

employment action' element of a prima facie case of retaliation." *E.g.*, *Hunt*, 277 F.3d at 769 (emphasis omitted).

[2] Wheat raises other issues on appeal including: being transferred to work with females; being bitten by a female resident; being denied medical information about the resident who bit her; being "denied support by [her] supervisors in difficult situations with" residents; being sexually harassed by a female resident; being "denied support of on the scene staff in physical confrontations with" residents; and being denied a timely performance evaluation. After thorough review, it is clear that Wheat provides no record support for any of these pre-termination "materially adverse action" allegations in connection with her asserted Title VII and FMLA rights.

with conclusory allegations . . . .'"); *Browning v. Sw. Research Inst.*, 288 F. App'x 170, 173 (5th Cir. 2008) ("[T]he nonmoving party 'must . . . set out specific facts showing a genuine issue for trial.' The nonmoving party, however, 'cannot satisfy this burden with conclusory allegations.'") (citation omitted); *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005) ("The plaintiff bears the burden of negating the defense and cannot rest on conclusory allegations and assertions but must demonstrate genuine issues of material fact . . . ."); *Geter v. Fortenberry*, 849 F.2d 1550, 1553 (5th Cir. 1988) ("[C]omplaints containing conclusory allegations, absent reference to material facts, will not survive motions to dismiss.").

A bare-bones allegation that an assignment of janitorial duties is a materially adverse action is only an unsupported conclusory claim. Such a bare allegation fails to provide the contextual detail that is required for materially adverse actions. In *Burlington*, 548 U.S. 53, 69, the Supreme Court made clear that context is critical. The Court observed that "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case." *Id.* at 71. Those circumstances are missing here. Indeed, *Burlington* illustrated that merely changing an employee's job title will not suffice to constitute a materially adverse action without further detail. *Id.* at 70–71. The Court reasoned that the record evidence indicated that the plaintiff was reassigned to perform "*only* standard track laborer tasks," "that the track laborer duties were by all accounts more arduous and dirtier," and "that the forklift operator position required more qualifications, which is an indication of prestige." *Id.* at 58, 71 (emphasis added) (internal quotation marks omitted). "Based on this record," the Court said, "a jury could reasonably conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee." *Id.* at 71 (emphasis added) (internal quotation marks omitted). Here, there is no record evidence that

provides any description, whatsoever, of Wheat's alleged temporary assignment of janitorial duties.

Furthermore, Wheat can find no succor in *Wilson v. Monarch Paper Co.*, 939 F.2d 1138 (5th Cir. 1991).  There, the employer had reassigned the plaintiff—a former "executive manager"—to a position as "an entry level warehouse supervisor with menial and demeaning duties." *Id.* at 1145.  We upheld the jury's finding that this conduct was "extreme and outrageous," pointing to record evidence regarding the plaintiff's qualifications (he "had been a long-time executive" with the employer and was "responsible for the largest project in the company's history," which he completed "on time and under budget"); the specific nature of the plaintiff's duties as warehouse supervisor (he "was frequently required to sweep the warehouse" and "was reduced to cleaning up after the employees in the warehouse cafeteria after their lunch hour"); and the extent to which his work time was occupied with the menial tasks ("Wilson spent 75 percent of his time performing these menial, janitorial duties."). *Id.* at 1145–46.  Wilson also had to perform all of his janitorial duties under a sign that read "Wilson is old." *Id.*  There is no record here that provides any suggestion of Wheat's duties, time spent, or the humiliation, if any, that she suffered.

Furthermore, nowhere in her complaint does Wheat allege why assignment to janitorial duties was an act of retaliation or an adverse employment action.  Before the district court, she alleged "Wheat was initially assigned to perform janitorial work and do intake.  A few weeks later, Wheat was assigned to Echo Mod which houses male juveniles.  In late April, early May, 2011, Wheat was notified by Donald Carter, Shift Supervisor, that she was being re-assigned to the girls' mod." Plaintiff's Statement of Uncontested Fact, Doc. 40-1, ¶16.  This statement is the complete reference to her assignment of janitorial duties that can be found in the record before the

district court. Nothing more. There is no indication that she raised the slightest objection to this assignment. There is no indication of how much time was spent doing these "janitorial duties" as opposed to doing "intake" work. The district court was never told whether she was asked to perform unpleasant "janitorial tasks" (e.g., cleaning bathrooms), "janitorial tasks" that were minor in nature (e.g., changing lightbulbs, dusting a few desks, or simply cleaning up her own desk), or, indeed, whether her tasks could reasonably be classified as janitorial at all. Nor was the district court told what portion of Wheat's work day was devoted to "janitorial duties." Was it all of her workday (as in *Burlington*, 548 U.S. at 58), 75 percent of her workday (as in *Wilson*, 939 F.2d at 1145), less than 5 minutes per week, or any part of her workday at all? Neither the district court nor we have the slightest idea.

Moreover, the dissent says that on appeal "the Commission admits that janitorial duties were not 'regular' duties of line officers." This alleged statement was never made before the district court; nor was it ever made by Wheat at any time. To be sure, the dissent mischaracterizes the Commission's brief in this respect. The Commission actually said:

> Moreover, Ms. Wheat has not offered any evidence that her being assigned such chores constituted different treatment from other JDS officers. Ms. Wheat offers no evidence that this short assignment of janitorial and intake duties was anything more than her supervisors finding work for her until regular JDS officer duties became available. This is a legitimate, non-retaliatory motivation. Applying the correct standard to these facts, it becomes apparent that this temporary assignment falls far short of being materially adverse to a reasonable employee in Ms. Wheat's position.

Appellee's Brief, p. 14–15. Properly read, the record does not exclude the possibility that some "janitorial duties" were expected of JDS officers generally—but especially those, like Wheat, who had just recently been hired or reinstated.

No. 14-30788

In sum, Wheat's mere assignment of janitorial duties, without further description or detail about what those duties actually were, does not state a materially adverse action under *Burlington* or *Wilson*. In short, she has failed to meet her burden of making a prima facie case of retaliation.

2.

Next, Wheat alleges that her performance evaluation was untimely and that "[a]ccording to the evaluation, [she] should have received a 4% pay increase." Although Wheat's performance evaluation form rated her Overall Job Performance Rating as "Very Good", the form *clearly stated* that she was not authorized for a step increase. More importantly, at the conclusion of her performance review, Wheat signed the findings of the review committee as follows:

> I have read this evaluation and reviewed a copy of it. I understand that my signature does not constitute or imply my agreement, *unless marked so*. Should I disagree with this rating, I understand that I my [sic] appeal to the appropriate manager.

ROA.403 (emphasis added).

Wheat also checked the box that read "I have reviewed and agree with this rating." *Id.* She did not object to or appeal this evaluation. Further, the record is silent as to why she did not elect to appeal. In short, Wheat produced no evidence to show that the delay in her evaluation or the failure to grant her 4% step increase—accompanied by a right of appeal that she did not exercise—constituted a materially adverse action.

The dissent concludes that it "*may* be materially adverse when an employee is effectively denied (or delayed by several months) a 4% raise indicated by her performance evaluation." (Emphasis added). Thus, the dissent, by the use of the word "may", seems to acknowledge that Wheat has failed to meet her burden of establishing her claim. Furthermore, the dissent asserts that a disputed issue of material fact exists based on the possibility

10

that the Commission's action "*may* be materially adverse when an employee is effectively denied . . . a 4% raise *indicated by her performance evaluation.*" (Emphasis added).  Even so, as previously indicated, the dissent's premise is wrong on the record facts.  This possibility is not enough to create a material fact or issue of law that bars summary judgment, especially when the underlying premise of such "possibility" appears to be false.

Therefore, Wheat has failed to meet her burden of making a prima facie case of retaliation for this claim.

3.

Next, Wheat alleges that the denial of a transfer request was a retaliatory, materially adverse action.  Specifically, Wheat requested the transfer because she objected to working around one particularly disruptive juvenile.  As with the janitorial duties, Wheat has presented no evidence that the denial of the reassignment made her job "objectively" worse.  *See Burlington*, 548 U.S. at 71.  It did not "affect[] her job title, grade, hours, salary, or benefits," nor is there any indication that working with females resulted in a "diminution in prestige or change in standing among her co-workers."  *See Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009).  Additionally, mere denial of a reassignment to a purely lateral position ("no reduction in pay and no more than a minor change in working conditions"), is typically not a materially adverse action.  *Burger v. Cent. Apartment Mgmt., Inc.*, 168 F.3d 875, 879 (5th Cir. 1999).  Furthermore, as the Commission points out, Wheat had worked, apparently without complaint, in the female section for eight years.

Therefore, under these circumstances, the denial of a reassignment was not, as a matter of law, an adverse action.  Accordingly, Wheat has not met her burden to establish a prima facie case of retaliation for this claim.

No. 14-30788

\*     \*     \*

Although the district court erroneously evaluated the Commission's allegedly retaliatory actions using the now-abrogated "ultimate employment decisions" standard, Wheat's pre-termination retaliation claims fail even under current law.  Thus, we affirm the district court's grant of summary judgment to the Commission with respect to these retaliation claims.

B.

Finally, we turn to Wheat's retaliatory termination claim.  It is clear that Wheat's discharge constitutes a "materially adverse action."  *See, e.g., Royal v. CCC&R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) ("It is clear that an adverse employment action occurred here—Royal was fired.").  We thus turn to Wheat's burden to show a "causal link" between her discharge and exercising her protected rights.  Again, it unclear whether the "causal link" requirement for FMLA retaliation claims involves the same "but for" analysis required for Title VII retaliation claims.  *See Nassar*, 133 S. Ct. 2517.  It is clear, however, that the plaintiff "may avoid summary judgment on 'but for' causation by demonstrating 'a conflict in substantial evidence on this ultimate issue.'"  *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 660 (5th Cir. 2012) ("Evidence is 'substantial' if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions.") (citation omitted).  As we shall see, however, here which standard we apply does not affect the outcome because Wheat's claim survives the heightened showing of "but for" causation.  Then, when the plaintiff sets out a prima facie case under *McDonnell Douglas*, "the burden shifts to the employer to state a legitimate, non-retaliatory reason for" the adverse action.  *Davis*, 765 F.3d at 490 (internal quotation marks omitted).

Initially, however, Wheat, as the plaintiff, bears the burden to provide substantial evidence for this claim.  Wheat must illustrate that "but for"

12

exercising her Title VII and FMLA protected rights, she would not have been discharged. Wheat effectively acknowledges the conduct with which she was charged, but contends that the actual cause of her termination was that she asserted her protected rights. She points to other specific instances in which she, and other employees as well, were physically excessive toward juveniles but not discharged.

In this connection, the record shows that Wheat herself was previously improperly excessive in dealing with a juvenile in 2005. At that time she had never asserted Title VII or FMLA rights. Responding to this 2005 incident, the FPJDC's Operations Manager "recommended three days suspension without pay and six months [of] probation." Affidavit of Steven Happel, at 4, ¶34. The Executive Director, however, "[r]ecognizing Ms. Wheat's 'exemplary job performance' . . . reduced the disciplinary action to a written reprimand" and required Wheat to "undergo additional training." *Id.* at ¶35. But with respect to the 2012 incident, after asserting her Title VII and FMLA rights, the Commission terminated Wheat's employment because, it said, "No JDS officer had ever physically attacked a youth resident before Ms. Wheat did, and, no JDS officer was allowed to remain in the Commission's employ after any such attack." Defendant's Amended Statement of Uncontested Fact, Doc. 39, ¶72. Wheat rebutted this assertion by offering evidence of other employees who were violent towards juvenile residents, but were not discharged by the Commission. *See* Plaintiff's Statement of Uncontested Fact, Doc. 40-1, ¶72. It was only after Wheat brought these allegations of the Commission's disparate treatment of its employees to the attention of the district court, that the Commission modified its reasons for termination. In its revised explanation for her discharge, the Commission asserted that Wheat's second "violent attack on a youth resident . . . gave the Commission compelling grounds to fire her to protect the health and safety of the youth residents." Defendant's Second

Reply Memo, Doc. 46, at 9.   After providing its revised explanation, the Commission did not make any reference, corrective or otherwise, to its original non-retaliatory explanation for discharging Wheat ("[n]o JDS officer [] ever physically attacked a youth . . . [or was] allowed to remain in the Commission's employ after any such attack").[3]   In other words, the grounds for Wheat's discharge related solely to the incidents of January 3, 2012, immediately preceding her discharge.   In this light, the Commission offers no evidence or argument to distinguish this different treatment of Wheat before and after exercising her protected rights.[4]   Therefore, the Commission's inconsistent treatment of Wheat raises disputed issues of material fact as to whether: but for exercising her rights she would have been discharged.

There is more, however.   There is evidence that the Commission has been inconsistent in its discharge of other employees who mistreated juveniles. Edwin Marshall, a "Night Supervisor," stated in his declaration that he was discharged after "chemically restrain[ing]" a juvenile who "refuse[d] to obey orders and continued to threaten staff with bodily harm."   Marshall Declaration, at 2.   But, when a different "supervisor restrained a . . . juvenile and gave the juvenile several knee strikes while the juvenile was in handcuffs," the Commission did not discharge him.   *Id.* at 2–3.

Thus, in sum, the record before us indicates that the Commission has discharged some employees for excessive force, but not others.   This mixed record constitutes substantial evidence of a genuine issue of material fact as to whether Wheat's discharge would have occurred "but for" exercising her

---

[3] On appeal, for the first time, the Commission "agree[d] that to the extent Ms. Wheat's prior use of excessive force shows that her conduct was not unprecedented, the Commission stood corrected." *Appellee Brief*, at 34.

[4] Although the Commission has consistently described the 2005 incident in its briefing before the district court, and this Court, it has never attempted to address or explain why it treated Wheat differently in 2005, than it did in 2012.

No. 14-30788

protected rights. Thus, the district court erred in granting summary judgment for the Commission.

## IV.

For these reasons, the district court's grant of summary judgment to the Commission with regard to Wheat's retaliatory termination claim is VACATED and the case is REMANDED for further consideration not inconsistent with this opinion. The judgment is AFFIRMED in all other respects.[5]

VACATED and REMANDED
in part; AFFIRMED in part.

---

[5] Wheat also alleged a sexual harassment claim under Title VII because a twelve-year-old, female resident under her supervision made sexual advances toward her. After reviewing the record, we find that this claim of inmate on employee harassment has no merit under Title VII against the employer. *See Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 401 (5th Cir. 2013) ("Relevant [Title VII harassment] factors are 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'") (citations omitted); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (rejecting a sexual-harassment claim in part because "[t]he ordinary terms and conditions of [the plaintiff's] job required her to review the sexually explicit statement" that formed the basis of the harassment complaint).

15

No. 14-30788

REEVES, District Judge, concurring in part and dissenting in part:

I agree that Lillie Wheat's retaliatory termination claim should proceed to trial, while her sexual harassment claim cannot survive summary judgment. Despite my agreement with much of the opinion, the majority errs when it finds no prima facie case of pre-termination retaliation. To reach that conclusion, the majority has to: (1) disregard record evidence, and (2) ignore the defendant's concession in the district court that Wheat *had* made out such a prima facie case. I therefore must respectfully dissent.

## I.

When a person sues her former employer and succeeds, she may not be welcomed back with open arms. Embarrassing facts may have been unearthed during the litigation; enemies may have been made. Facing scorn upon return is not itself retaliation, true – but it is only natural for an employee to be alert to the possibility. Retaliation still happens in this day and age. *See, e.g.*, *Brown v. Mississippi Dep't of Health*, 256 F. App'x 710 (5th Cir. 2007) (affirming jury verdict finding that the Mississippi Department of Health racially discriminated against Albert Brown); *Brown v. Mississippi Dep't of Health*, 550 F. App'x 228 (5th Cir. 2013) (affirming jury verdict finding that the Mississippi Department of Health retaliated against Brown because he had prevailed in his earlier racial discrimination suit).

Wheat was an Assistant Director at the Florida Parishes Juvenile Detention Center (FPJDC). After years of dutiful service, she was fired while on FMLA leave and had to seek judicial relief to get her job back. Wheat reached an amicable settlement and returned to work. Upon her return, though, FPJDC assigned Wheat to janitorial duties for three weeks.

That's retaliation as a matter of common sense. I recognize that there is not always a perfect overlap between common sense and the law, but in this

No. 14-30788

case they are one and the same. In other words, common sense tells me that the reassignment was obvious retaliation, and the rules of procedure instruct that the issue should be resolved by a jury.

**II.**

The majority begins with an "important" reminder: FPJDC is a correctional institution "primarily for youths who are emotionally challenged, exhibit drug and alcohol problems, mental problems, and suicidal tendencies." Slip Op. at 4. The description comes from the affidavit of Steven Happel, FPJDC's Director of Administration.

I personally find this description unfortunate. "Emotionally challenged" is not a clinical diagnosis. "Suicidal tendencies" probably should have read "suicidal ideation." And claiming that these children have "mental problems" is hopelessly vague if not outright offensive.

FPJDC is a typical juvenile detention center, not a specialized treatment facility. Like other juvenile detention centers, it houses a variety of children. Some have committed criminal offenses. Others are victims of violence seeking refuge. And quite a few shouldn't be there in the first place – especially those who face no criminal charges. *See N.G. v. Connecticut*, 382 F.3d 225, 239 (2d Cir. 2004) (Sotomayor, J., concurring in part and dissenting in part) (describing the "troubled adolescent girls facing no criminal charges" who were detained and subjected to squat-and-cough strip searches).

The truth is that kids are detained in juvenile detention centers for all kinds of behavior. Hundreds of thousands of children run away from home after suffering sexual or physical abuse. Lois A. Weithorn, *Envisioning Second-Order Change in America's Responses to Troubled and Troublesome Youth*, 33 Hofstra L. Rev. 1305, 1379 (2005). Yet hundreds of thousands of these "status

17

offenders" wind up in juvenile detention centers each year.[1] Patricia J. Arthur & Regina Waugh, *Status Offenses and the Juvenile Justice and Delinquency Prevention Act: The Exception That Swallowed the Rule*, 7 Seattle J. for Soc. Just. 555, 555-56 (2009). Children have even been arrested for minor schoolhouse disciplinary infractions including "texting, passing gas in class, violating the school dress code, stealing two dollars from a classmate, bringing a cell phone to class, arriving late to school, or telling classmates waiting in the school lunch line that he would 'get them' if they ate all of the potatoes." Jason P. Nance, *Students, Police, and the School-to-Prison Pipeline*, --- Wash. U. L. Rev. ---, at \*5-6 (last rev'd Nov. 2, 2015), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2577333.[2] Vague claims that they have "mental problems" therefore says little about the children.

Still, as Judge, my duty is to set aside my personal views and examine the evidence. At the summary judgment stage in particular, Judges "do not weigh the evidence, assess its probative value, or resolve any factual disputes." *Aubrey v. Sch. Bd. of Lafayette Par.*, 92 F.3d 316, 318 (5th Cir. 1996).

In this case, my duty requires me to acknowledge that the majority's description of FPJDC is accurately drawn from competent summary judgment evidence: Happel's affidavit.

In her summary judgment response, Wheat (through counsel) argued generally that Happel's characterization was ambiguous and irrelevant. A more specific objection may have had some merit at trial, but Wheat failed to

---

[1] "Status offenders" include children who have run away, skipped school, or broken curfew, among other things. *See* Arthur & Waugh, 7 Seattle J. for Soc. Just. at 555.

[2] "The 'School-to-Prison Pipeline' (STPP) refers to the framework of the United States school system that, by design, pushes students out of public schools through suspension or expulsion and into a juvenile detention facility or prison." Matthew W. Burris, *Mississippi and the School-to-Prison Pipeline*, 3 Widener J.L., Econ. & Race 1, 2 (2011).

No. 14-30788

submit evidence contradicting this portion of Happel's affidavit.[3] As a result, the only evidence on this point is from Happel, and the majority is justified in relying upon it in the opinion.

## III.

I described the above only because the majority has not given the same deference to Wheat's evidence of pre-termination retaliation.

First, the majority errs by disregarding Wheat's sworn declaration that she "was initially assigned to perform janitorial work and do intake" upon her return to work. That too is evidence. *See* Fed. R. Civ. P. 56(c)(1)(A) (listing declarations as competent summary judgment evidence). The majority's assertions that the declaration was merely "an allegation," a "bare-bones allegation," "an unsupported conclusory claim," and "a bare allegation" are incorrect as a matter of law. Slip Op. at 7. There is no justification for discounting this evidence.

The majority's error is compounded when it concludes that janitorial duties are not materially adverse. My colleague has defined materially adverse as something which inherently causes harm to an employee. *Halliburton Co. v. Admin. Review Bd.*, 596 F. App'x 340, 341 (5th Cir. 2015) (Jolly, J., dissenting from the denial of rehearing en banc). In other words, something is materially adverse when "the negative effect on the employee is clear." *Id.*

Common sense suggests that a downward reassignment to janitorial duties has a clear negative effect on the employee. The plain meaning of janitor is someone who cleans up after others. *See, e.g.*, Webster's Third New

---

[3] In fact, Wheat is equally if not more qualified than Happel to describe the needs of the children in her care. She had worked at FPJDC longer than Happel, and had risen through the ranks as a line officer, Shift Supervisor, and then Assistant Director. But Wheat's counsel failed to submit evidence from Wheat (or anyone else) on this point.

No. 14-30788

International Dictionary 1209 (1993) (defining janitor as "one that keeps the premises of an apartment, office, or other building clean and free of refuse"). Janitors sweep. They dust. They mop. They pick up and take out the trash. They clean up messes others make by accident or by slothfulness. The unfortunate contradiction inherent in their jobs, like so many jobs today, is that they perform essential functions for *other* professionals yet receive low pay, have little status, and are too-often invisible.[4] It would be a demotion for anyone not hired as a janitor to be reassigned to janitorial duties.

If plain meaning is not enough, decisions from the Supreme Court and two courts of appeal, including this one, support the conclusion that reassignment to janitorial duties is materially adverse.

In *Burlington Northern*, the Supreme Court held that a job reassignment is materially adverse when it involves "dirtier" work, has less "prestige," and is objectively considered a worse job. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006). The majority opinion quotes these criteria but applies them in the exact wrong way. If reassignment to janitorial tasks – dirtier, less prestigious, and worse than other duties – does not satisfy *Burlington Northern*, what would?

This very Court has found that reassignment to janitorial duties is materially adverse. In *Wilson v. Monarch Paper Company*, a former Vice President won a $3.4 million jury verdict after he was reassigned to perform "housekeeping chores," sweeping, and cafeteria cleanup. 939 F.2d 1138, 1145

---

[4] In 2014, there were approximately 2,360,600 janitors and building cleaners in America. Their median wage in May of that year was $10.98 an hour. Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, 2014-15 Edition, Janitors and Building Cleaners, http://www.bls.gov/ooh/building-and-grounds-cleaning/janitors-and-building-cleaners.htm (last visited Dec. 22, 2015).

(5th Cir. 1991). In affirming, my colleague described those chores as "extreme and outrageous" retaliation. *Id.* He added,

> We find it difficult to conceive a workplace scenario more painful and embarrassing than an executive, indeed a vice-president and the assistant to the president, being subjected before his fellow employees to the most menial janitorial services and duties of cleaning up after entry level employees: the steep downhill push to total humiliation was complete.

*Id.* That holds true even when non-executives are reassigned to janitorial duties. *See Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (concluding at summary judgment that truck assembler's reassignment from her regular position to unspecified janitorial duties was materially adverse).

The majority endeavors mightily to distinguish our case from *Wilson*.[5] It has convinced me of only two salient distinctions.

The first – and the elephant in the room – is that this Court refused to allow a white-collar corporate executive to be reassigned to janitorial duties, but will allow a blue-collar correctional officer to be reassigned to those duties. Why that makes sense in a system predicated upon equal justice under law is beyond me.[6] "In my conscientious view, the Court should . . . mete out employee rights on the same standard to all." *Halliburton*, 596 F. App'x at 342 (Jolly, J., dissenting from the denial of rehearing en banc); *see also Thompson v. City of Waco, Tex.*, 779 F.3d 343, 345 (5th Cir. 2015) (Jolly, J., dissenting from the

---

[5] The majority has not attempted to distinguish our case from *Hoyle*.

[6] In *Wilson*, my colleague could not conceive a workplace scenario more painful and embarrassing than demotion to janitorial duties. It is difficult to reconcile those statements with today's admonishment that Wheat should have explained (in her complaint no less) "why assignment to janitorial duties was an act of retaliation or an adverse employment action." Slip Op. at 9. It was just last year that the Supreme Court rebuked this court for insisting that a complaint contain such a "punctiliously stated theory of the pleadings." *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 347 (2014) (per curiam) (quotation marks and citation omitted).

denial of rehearing en banc) (complaining that "a particular panel can find language, and indeed even legal principles, that likely will support any conclusion that it may reach" as to whether an adverse employment action has occurred).

The second distinction is that Wilson presented evidence to a jury about the extent and nature of his janitorial duties, while Wheat has not yet had that opportunity. But the reason for this is obvious.

Wheat submitted evidence that she had been assigned janitorial duties, and argued that those duties were materially adverse. In response, FPJDC *conceded* for purposes of summary judgment "that the plaintiff has established her *prima facie* case with respect to her FMLA retaliation and Title VII gender discrimination claims." While it moved on to argue that it had a legitimate reason for terminating Wheat and that Wheat had failed to show pretext – *i.e.*, the second and third steps of the *McDonnell Douglas* analysis – it never complained of ambiguity or introduced counter-evidence on the specifics of Wheat's janitorial duties.[7]

In other words, battle was not joined in the briefing or evidence over the materially adverse element the majority finds lacking today: the nature of Wheat's janitorial "duties, time spent, or the humiliation, if any, that she suffered." Slip Op. at 9. The evidence that she performed those duties was conceded to the defendant's satisfaction, and the plain meaning of what those duties entail – dirtier, less prestigious, and worse than other tasks – went

---

[7] The defendant's concession renders moot whether janitorial duties were regularly expected from line officers at the facility. On that point, however, the defendant's appellate brief states that when Wheat was reinstated as a JDS officer, "for the first few weeks after her reinstatement, she was given janitorial and intake duties, before being assigned *regular* JDS duties." Defendant's Brief at 14 (emphasis added). I take that to mean that janitorial and intake duties were not regular duties of an officer in Wheat's position.

unchallenged.[8] Wheat simply had no duty to detail the adversity inherent in her reassignment to janitorial duties.

From all this I conclude that the majority's we-don't-know-what-janitorial-duties-really-means argument cannot be considered on appeal because it was not made in the district court.[9] And it would be "gratuitous for the majority to aid [a party] with a . . . theory of its own devising. Instead, we should consider the . . . argument that [it] actually makes." *Mabary v. Home Town Bank, N.A.*, 771 F.3d 820, 828 (5th Cir. 2014) (Jolly, J., dissenting), *opinion withdrawn* (Jan. 8, 2015); *see also United States v. Pope*, 452 F.3d 338, 351 n.4 (5th Cir. 2006) (Jolly, J., dissenting) ("an appeals court should not

---

[8] Defense counsel likely assumed, reasonably, that Judges reviewing evidence for summary judgment purposes are aware of the ordinary meaning of janitorial duties, both as a matter of what that job physically entails and its attendant everyday meaning. Since it was obvious and unchallenged, Wheat did not have to attach evidence quantifying the amount of trash she had to pick up or the esteem in which her colleagues held janitorial work.

Consider other examples from everyday life: When a maître de is assigned to do the duties of a waiter or bus-boy, would there have to be a long discussion about what those specific duties are? Or wouldn't the parties simply agree that the bus-boy cleans tables while the waiter takes orders and caters to the diners? Is there any doubt that a concierge would view the tasks of a hotel maid as less prestigious? If the business manager of an Am Law 100 firm was assigned to be a receptionist or runner, we would have no problem understanding the nature of the duties and the significance of the demotion. Or would we?

[9] "It is well settled in this Circuit that the scope of appellate review on a summary judgment order is limited to matters presented to the district court." *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 339 (5th Cir. 2005) (citations omitted). When arguments are "not even mentioned, much less argued, in the defendants' motion for summary judgment, in the plaintiffs' response to the motion for summary judgment, or in the district court's memorandum opinion granting summary judgment," they are "not properly presented to the district court" and cannot be considered on appeal. *Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002).

The district court dismissed Wheat's janitorial reassignment by reasoning that three weeks' worth of those duties did not rise to the level of an ultimate employment decision. But that finding was infected by the application of what all parties and panel members agree was the wrong legal standard. The correct question is whether Wheat's reassignment was materially adverse. It was. *See Halliburton*, 596 F. App'x at 340-41.

attempt to relitigate an issue forfeited below"), *opinion withdrawn and superseded,* 467 F.3d 912 (5th Cir. 2006).

We need not debate the relative strength of Wheat's evidence. As my colleague explained last year, in a case in which he found "feeble evidence,"

> [w]e have recognized at the summary judgment stage that the nonmoving party need not reduce all its evidence to an admissible form. Although it appears to me that much of the evidence is currently vague and relies heavily on speculation, I believe the panel has exercised appropriate caution by remanding this case to proceed with a trial.

*Roque v. Natchitoches Par. Sch. Bd.*, 583 F. App'x 466, 471 (5th Cir. 2014) (Jolly, J., concurring) (citation omitted). This sound advice should be applied here. *Accord Hoyle*, 650 F.3d at 334 ("[W]e have never held that a weak case is necessarily one that should be disposed of on summary judgment. The question at the summary judgment stage is not whether a jury is *sure* to find a verdict for the plaintiff; the question is whether a reasonable jury could rationally so find.").

With respect, I cannot join Part III.A of the majority opinion.[10]

---

[10] Although less compelling, the majority's analysis of Wheat's delayed raise also merits discussion. At least to my eyes, Wheat's performance evaluation showed that her "Very Good" rating made her due for a 4% step increase. I am not sure how the majority concludes otherwise. Slip Op. at 10.

Other record evidence supports an inference that Wheat should have received that evaluation and step increase months earlier. The affidavit of Assistant Shift Supervisor Brennan Sessions stated that "Ms. Wheat consistently earned *annual* pay raises, and her job performance evaluations were either 'Very Good' or 'Outstanding.'" (Emphasis added). Since she reasonably expected annual raises tied to her annual performance reviews, it is premature to conclude that the delay was nonretaliatory, particularly when combined with the other retaliatory act (e.g., the janitorial duties).

No. 14-30788

**IV.**

A final word is owed on Wheat's sexual harassment claim. As the majority correctly concludes, Wheat's interactions with the alleged harasser did not objectively create a severe or pervasive hostile work environment.

At the same time, I do not think the majority suggests – and I would not agree if it had – that inmate-on-employee sexual harassment claims will always fail because correctional officers should expect severe or pervasive sexual advances as "ordinary terms and conditions" of their job. Slip Op. at 15 n.5 (quotation marks and citation omitted). That proposition is unsupported by case law. *See Beckford v. Dep't of Corr.*, 605 F.3d 951, 953 (11th Cir. 2010) ("We conclude that the jury was entitled to find the [Florida Department of Corrections] liable under Title VII because it unreasonably failed to remedy the sexual harassment by its inmates."); *Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 550 n.2 (8th Cir. 2007); *Freitag v. Ayers*, 468 F.3d 528, 538 (9th Cir. 2006) ("the [California Department of Corrections and Rehabilitation's] contention that it cannot, as a matter of law, be liable under Title VII for maintaining a hostile work environment caused by inmate misconduct . . . is unsupported by the entire weight of case authority in this circuit and others"); *Slayton v. Ohio Dep't of Youth Servs.*, 206 F.3d 669, 679 (6th Cir. 2000) (affirming liability on hostile work environment claim where, among other things, the supervisor "intentionally sent [the plaintiff, a correctional officer in a juvenile facility] to check on an inmate who was masturbating").

Given the weight of these authorities, and the fact that the legal question is avoidable in this case, I would leave the issue for another day. *See Valdiviez-Hernandez v. Holder*, 739 F.3d 184, 193 (5th Cir. 2013) (Jolly, J., concurring) ("I can see no compelling reason to initiate a circuit split").

No. 14-30788

For these reasons, I respectfully dissent in part.